852 A.2d 1093

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–APPELLANT, v. P.P. AND S.P., DEFENDANTS–RESPONDENTS.

IN THE MATTER OF THE GUARDIANSHIP OF J.P. AND B.P., MINORS–RESPONDENTS.

Argued February 3, 2004—Decided July 27, 2004.

*Jessica M. Steinglass,* Deputy Attorney General, argued the cause for appellant (*Peter C. Harvey,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel).

*Edward P. Marable, Jr.,* Assistant Deputy Public Defender, argued the cause for minor respondents J.P. and B.P., (*Yvonne Smith Segars,* Public Defender, attorney; *Ellen J. Goldfinger,* Assistant Deputy Public Defender, on the letter brief).

*Alan I. Smith,* Designated Counsel, argued the cause for respondent S.P. (*Yvonne Smith Segars,* Public Defender, attorney).

*Alison S. Perrone,* Designated Counsel, argued the cause for respondent P.P. (*Yvonne Smith Segars,* Public Defender, attorney).

*Cecilia M. Zalkind* submitted a brief on behalf of *amicus curiae,* Association for Children of New Jersey.

Chief Justice PORITZ delivered the opinion of the Court.

In this consolidated appeal the Appellate Division has reversed an August 8, 2002, trial court order terminating the parental rights of a mother, P.P., and father, S.P., as to their two minor daughters. The children, J.P. and B.P., had been cared for in separate households by their paternal and maternal grandmothers, E.P. and M.B., who wished to adopt them. The Appellate Division remanded the matter for a "current evaluation of the mother and father and a comparative bonding evaluation of the children." The panel also required consideration of the Kinship Guardianship Act, *N.J.S.A.* 3B:12A–1 to –7 (Kinship Act or Act), as an alternative to termination should the trial court then determine that neither P.P. nor S.P. is able to parent the children. We now affirm and modify the judgment of the Appellate Division.

## I.

When she was born on February 9, 1999, J.P. tested positive for heroin and her mother tested positive for cocaine and opiates. The child's father was incarcerated for a probation violation at the time of her birth. It is undisputed that both the mother and father have extensive histories of chronic substance abuse dating as far back as their pre-adolescent years. Following J.P.'s birth, P.P. voluntarily placed her in foster care through the Division of Youth and Family Services (DYFS) and entered an in-patient drug treatment program in Paterson, New Jersey. As a result of P.P.'s progress in the program, J.P. was placed in her mother's custody in April 1999. In July 1999, however, P.P. relapsed and subsequently left the program without permission in August 1999.

P.P. and her daughter moved in with J.P.'s paternal grandmother, E.P. Almost a year later, on July 7, 2000, P.P. informed a DYFS caseworker that she was living with S.P. and J.P. at E.P.'s home. She was then five months pregnant and attending a methadone maintenance program. As a result, when her second daughter B.P. was born on September 23, 2000, B.P. tested positive for methadone and exhibited drug withdrawal and feeding

difficulties. P.P. admitted to having used heroin two days before the birth of her child.

Because of both parents' continued drug use, on October 4, 2000, DYFS filed an Order to Show Cause for Custody, Care and Supervision against the mother and father, seeking legal custody of their two daughters who were then 16 months (J.P.) and just over one week old (B.P.). J.P. was placed in the physical custody of her paternal grandmother, whereas, on her release from the hospital, B.P. was initially in foster care and shortly thereafter moved to the physical custody of her maternal grandmother. Both children currently reside with their respective grandmothers, E.P. and M.B.,[1] who, at the time of the termination hearing indicated a desire to adopt them.

Following the children's placement and pursuant to court order, DYFS attempted to provide rehabilitation opportunities for the parents with a goal toward reunification with their children. Drug and alcohol assessments carried out on October 24, 2000, led to recommendations that they both enter in-patient drug treatment programs. Despite several referrals, however, neither P.P. nor S.P. obtained treatment. Months after the assessments, on April 26, 2001, P.P. called DYFS to inform the caseworker that she and S.P. were planning to enroll in a detoxification program for a week and then an in-patient program for six months. Subsequent investigation revealed that P.P. and S.P. failed to attend either program.

The Division referred the parents to Antonio Burr, Ph.D., for psychological evaluations. After evaluating P.P. on January 1, 2001, Dr. Burr reported that she had a substantial history of substance abuse, that she had attended various drug treatment programs without success, and that she was using heroin at the time of the evaluation. Absent proper medication and psychotherapy, Dr. Burr concluded that P.P. would "remain at very high risk

---

[1] As noted by the Appellate Division, P.P.'s eight-year-old son was also residing with his maternal grandmother, M.B. His status is not at issue in this case.

of continued heroin use, and will not be a good candidate to parent any of her children in the foreseeable future." S.P. never completed the evaluation. In February 2001, both parents admitted to the court that they would test positive for heroin. As a consequence, the court suspended parental visitation and ordered further psychological and psychiatric evaluations, to be followed by long-term, in-patient substance abuse treatment.

On October 25, 2001, about a year after J.P. and B.P. were placed in the care of their grandparents, DYFS filed a Complaint for Guardianship against P.P. and S.P., seeking termination of their parental rights predicated on the parents' abuse and neglect and on their extensive drug histories. That same October, only a few weeks before the complaint was filed, the parents finally entered long-term, in-patient substance abuse treatment programs. Although P.P. had had at least three failed attempts at treatment, this was the first time S.P. enrolled in such a program. During this period, drug tests of the parents were consistently negative and progress reports from a DYFS caseworker in respect of P.P., and from counselors involved with S.P., indicated significant improvement. The court reinstated visitation for P.P. on October 25, 2001, and for S.P. on December 20, 2001, and DYFS arranged biweekly visitation with the children beginning January 2002. Those visits went well, although M.B., the maternal grandmother, was "less than encouraging." At the time of trial in August 2002, both parents remained in treatment, with P.P. requiring at least ten months, and S.P. requiring at least six months, until completion.

During the trial, Dr. Frank Dyer testified on behalf of DYFS. Based on his review of the case history and on psychological evaluations of the parents conducted in March 2002, as well as bonding evaluations of both the parents and their children, and the children and their respective caretakers, Dr. Dyer concluded that neither P.P. nor S.P. would be able effectively to parent the children in the foreseeable future. He based his conclusion on the parents' substantial history of substance abuse and their psycho-

logical problems. Dr. Dyer also found that the parents' interaction with their children "fell somewhat short of what one would expect of an individual to whom the care of a child is to be entrusted." In his view, P.P. and S.P. exhibited deeply ingrained character issues relating to narcissism, irresponsibility, and contempt for rules, although he conceded that successful completion of their individual drug treatment programs would improve their ability to parent the children. In respect of bonding, he concluded that J.P. and B.P. were profoundly attached to their respective grandmothers despite positive interaction with their parents, such that removal of either child would cause "severe and enduring psychological harm, ... most likely, ... impaired self-esteem, impaired basic trust, and an impaired capacity to form new attachments to others." Dr. Dyer ultimately recommended that the paternal grandmother, E.P., adopt J.P., and that the maternal grandmother, M.B., adopt B.P.

Another DYFS expert, Dr. Ferretti, who had also evaluated P.P. prior to trial, testified that despite the "significant change in her prior behavior ... she must be regarded as a high risk individual because of her history of multiple relapses in the past."

Two weeks before trial in July 2002, Dr. Paul Fulford conducted a psychological evaluation of S.P., and thereafter testified on his behalf. Dr. Fulford stated that S.P. would be unable to provide a safe and stable home for his children at that time, and further, that reunification could not be considered until S.P. successfully completed drug rehabilitation and vocational training, and secured appropriate housing. He agreed that reunification then would be an alternative to termination of parental rights, but did not feel that he could "make a full recommendation as to that." Although he believed S.P. was making progress toward completion of his program, Dr. Fulford acknowledged that even if S.P. eventually was able to care for his children, their attachment to their respective caretakers would have to be reassessed before reunification could be considered. He did not believe, however, that a

delay of several months would have a significant effect on the children.[2]

Despite the parents' progress, DYFS pressed for termination of parental rights and adoption by the paternal and maternal grandparents in accordance with Dr. Dyer's recommendation. Because of P.P.'s failed attempts at rehabilitation and S.P.'s earlier refusal even to participate in treatment, and because neither P.P. nor S.P. had completed their recovery programs, DYFS claimed that "return[ing] the children to [their parents] would expose the children to an unacceptable level of risk of harm."

At the close of trial on August 6, 2002, the court rendered an oral decision terminating parental rights "on the grounds of the 'best interests of the child,'" under the standards set forth in *N.J.S.A.* 30:4C–15.1a (1) through (4). Based on the evidence and testimony presented at trial, the court found that DYFS had satisfied its burden to demonstrate through clear and convincing evidence that defendants were unable to provide a safe and stable home at that time and in the foreseeable future. The court relied on the undisputed opinion of Dr. Dyer and further determined that separating the children from their respective caretakers would cause severe and enduring harm. Finally, the court held that kinship legal guardianship was not an appropriate alternative to adoption, since adoption would provide J.P. and B.P. with the "most secure, permanent relationship that we know short of parents taking care of their own children." An order granting guardianship to DYFS was entered.

On appeal, the parents argued, among other things, that DYFS failed to meet its burden for termination of parental rights. Specifically, P.P. claimed that she had made substantial progress in overcoming her addiction, and that the trial court erred in refusing to consider kinship legal guardianship, authorized by *N.J.S.A.* 3B:12A–1, as an appropriate alternative to severing the

---

[2] P.P. testified at the trial, but expert testimony was not presented on her behalf.

parental relationship. S.P. asserted that DYFS had failed to support the parent-child bond, and also had failed to sustain its burden of proving that termination of parental rights would be in the best interests of his children.

The Appellate Division determined that DYFS had not presented clear and convincing evidence justifying termination of parental rights under *N.J.S.A.* 30:4C–15.1, and reversed the trial court, remanding the matter for further proceedings. The panel was most troubled by the unusual history of the case and expressed that concern in the opening paragraph of its opinion, stating:

> Unlike many termination cases we have recently seen where the child or children have been in non-biological caregivers' placement and non-biological adoption is anticipated, the termination here was preparatory for adoption of one child, J.P., by her paternal grandmother, E.P., and of the other child, B.P., by her maternal grandmother, M.B. Moreover, this is not a case in which the children have not had, and maintained through visitation after removal, a continuing relationship with their parents. *Contra New Jersey Div. of Youth & Family Servs. v. A.G.*, 344 *N.J.Super.* 418, 782 *A.2d* 458 (App.Div.2001), *certif. denied*, 171 *N.J.* 44, 791 *A.2d* 222 (2002). And at the time of trial, in August 2002, both parents had successfully completed the initial phases of their respective intensive 18–month drug treatment programs, where they had been enrolled since October 2001, and were in the process of completing the next phase of their rehabilitation.

More specifically, the court held that DYFS "failed to fully consider alternatives to termination of parental rights, especially kinship legal guardianship pursuant to *N.J.S.A.* 3B:12A–1(a)." Because the parents were making "substantial progress" in their respective drug treatment programs at the time of trial and continued to desire reunification with their children, and because of "their history of successful visitation ..., the continuing affectionate relationship [with] their daughters, the felt need to preserve the sibling relationship, and the uninterrupted relative placements," the court rejected the lower court's finding that the parents were "unable to eliminate the harm facing the child[ren]" or that "[t]ermination of parental rights would not do more harm than good." *N.J.S.A.* 30:4C–15.1a(2)(4). The panel concluded:

> Accordingly, we remand for further proceedings. Those proceedings should include a current evaluation of the mother and father and a comparative bonding evaluation of the children. If it is determined that either P.P. or S.P., is, or both are, presently fit to parent J.P. and B.P., reunification steps shall begin. If present

fitness is not demonstrated, however, application of the Kinship Guardianship Act shall be considered as an alternative to termination. In the meantime, custody of J.P. shall remain with the paternal grandmother, E.P., and custody of B.P. with the maternal grandmother, M.B., who shall fully cooperate and support immediate resumption of visitation with the parents under such considerations as determined appropriate by the trial judge.

We granted certification, 178 *N.J.* 34, 834 *A.*2d 406 (2003), to consider the standards for termination under *N.J.S.A.* 30:4C–15.1a in light of the placement option provided by the Act, and because of a split in the Appellate Division over the applicability of kinship legal guardianship in a termination proceeding. *See New Jersey Div. of Youth & Family Servs. v. S.V.,* 362 *N.J.Super.* 76, 826 *A.*2d 821 (App.Div.2003). Participation of *amicus curiae,* Association for Children of New Jersey, was granted on January 14, 2004.

## A.

■ Termination of parental rights permanently severs the relationship between children and their biological parents. Indeed, "[f]ew forms of state action are both so severe and so irreversible." *Santosky v. Kramer,* 455 *U.S.* 745, 759, 102 *S.Ct.* 1388, 1398, 71 *L.Ed.*2d 599, 610 (1982); *New Jersey Div. of Youth & Family Servs. v. A.W.,* 103 *N.J.* 591, 600, 512 *A.*2d 438 (1986). Nonetheless, "[p]arental rights, though fundamentally important are not absolute. The constitutional protection surrounding family rights is tempered by the State's *parens patriae* responsibility to protect the welfare of children." *In re Guardianship of K.H.O.,* 161 *N.J.* 337, 347, 736 *A.*2d 1246 (1999) (citation omitted); *see A.W., supra,* 103 *N.J.* at 599, 512 *A.*2d 438 ("[T]he right of parents to be free from governmental intrusion is not absolute."). More recently, "concern has arisen for the best interests of children whose parents have forsaken their parental duties. The child's right to a permanent home has gained increasing prominence." *In re Adoption of Children by G.P.B., Jr.,* 161 *N.J.* 396, 404, 736 *A.*2d 1277 (1999) (citation omitted).

■ To achieve permanency, *N.J.S.A.* 30:4C–15.1a requires DYFS to file for guardianship by instituting a termination pro-

ceeding when such action would be in the "best interests of the child." The grounds for termination of parental rights are codified in subsections (1) through (4) of *N.J.S.A.* 30:4C–15.1a, and are designed to balance parental rights and the State's *parens patriae* responsibility to protect the welfare of children. *K.H.O., supra,* 161 *N.J.* at 347, 736 *A.*2d 1246. In other words, under the "best interests of the child" standard, as set out in the statute, parental rights may be terminated on a showing by clear and convincing evidence [3] that the following criteria have been met:

(1) The child's safety, health or development have been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his foster parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[*N.J.S.A.* 30:4C–15.1a.]

We have explained the application of this provision in *K.H.O.* "The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." *K.H.O., supra,* 161 *N.J.* at 348, 736 *A.*2d 1246. First, the trial court must consider whether the parent has harmed or is likely to continue to harm the child. "Harm, in this context, involves the endangerment of the child's health and development resulting from the parental relationship." *Ibid.* (citing *N.J.S.A.* 30:4C–15.1a(1)). Rather than focusing on a single or isolated harm, the standard may be triggered by an accumulation of harms over time. *Ibid.* Second, there must be a

---

[3] *See Santosky v. Kramer,* 455 *U.S.* 745, 768–70, 102 *S.Ct.* 1388, 1402–03, 71 *L. Ed.*2d 599, 616–17 (holding that state may not sever parental rights under Due Process Clause of Fourteenth Amendment unless allegations supported by clear and convincing evidence).

showing that the harm "continue[s] because the parent is unable or unwilling to overcome or remove [it]." *Ibid.* (citing *N.J.S.A.* 30:4C–15.1a(2)). Included in that inquiry is whether delay in permanency will cause further harm and whether the child has bonded to his or her foster parents to the extent that separation from them would in itself "cause serious and enduring emotional or psychological harm to the child." *N.J.S.A.* 30:4C–15.1a(2). Third, DYFS must make "reasonable efforts to provide services to help the parent" eliminate the harm and reunite the family, and "the court ... [must] consider[ ] alternatives to termination of parental rights." *N.J.S.A.* 30:4C–15.1a(3). Even when those criteria are met, *N.J.S.A.* 30:4C–15.1(a)(4) requires a finding that ending the parent-child relationship "will not do more harm than good."

## B.

A relatively new concept in this State, kinship legal guardianship has been available only since January 1, 2002. *L.* 2001, *c.* 250, § 1, eff. Jan. 1, 2002. The Kinship Act begins with a statement of findings and declaration of purpose useful to our analysis:

The Legislature finds and declares that:

a. There is an increase in the number of children who cannot reside with their parents due to the parents' incapacity or inability to perform the regular and expected functions of care and support of the child; [4]

b. An increasing number of relatives, including grandparents, find themselves providing care on a long-term basis to these children without court approved legal guardianship status because the caregivers either are unable or unwilling to seek termination of the legal relationships between the birth parent and the child, particularly when it is the caregiver's own child or sibling who is the parent. *In these cases, adoption of the child is neither feasible nor likely,* and it is imperative

---

4 As we noted in *In re Adoption of Children by G.P.B.*, "regular and expected parental functions" are defined at *N.J.S.A.* 9:3–46, and constitute the "core values of parenthood," *i.e.*, maintenance of the parental relationship, communication between parent and child, and providing financial support for the child. 161 *N.J.* 396, 405–06, 736 *A.2d* 1277 (1999) (quoting *In re Adoption of a Child by W.P. and M.P.,* 308 *N.J.Super.* 376, 385, 706 *A.2d* 198 (App.Div.1998)).

that the State create an alternative, permanent legal arrangement for children and their caregivers. One such alternative arrangement, which does not require the termination of parental rights, is a court awarded kinship legal guardianship that is intended to be permanent and self-sustaining, as evidenced by the transfer to the caregiver of certain parental rights, but retains the birth parents' rights to consent to adoption, the obligation to pay child support, and the parents' right to have some ongoing contact with the child;

 c. In considering kinship legal guardianship, the State is seeking to add another alternative, permanent placement option, beyond custody, without rising to the level of termination of parental rights, for caregivers in relationships *where adoption is neither feasible nor likely;* and

 d. Therefore, it is in the public interest to create a new type of legal guardianship that addresses the needs of children and caregivers in long-term kinship relationships.

 [*N.J.S.A.* 3B:12A–1 (emphasis added).]

 When adoption is neither feasible nor likely, particularly in those cases where the caregiver's own child or sibling is the parent, an alternative, permanent legal arrangement is available for children and their caregivers. As stated by the Senate Budget and Appropriations Committee when it reported Senate Bill No. 1813 out of committee, "[k]inship legal guardians are caregivers who have a biological, legal, extended or committed emotional or psychological relationship with a child and who are willing to assume care of the child due to parental incapacity or inability, with the intent to raise the child to adulthood. Kinship legal guardianship does not terminate parental rights." Senate Budget and Appropriations Committee, *Statement to Senate Bill No. 1813* (June 25, 2001), *reprinted in N.J.S.A.* 3B:12A–1. Rather, the kinship legal guardian is "responsible for the care and protection of the child and for providing for the child's health, education, and maintenance," *N.J.S.A.* 3B:12A–2, until "the child reaches 18 years of age or ... is no longer continuously enrolled in a secondary education program whichever event occurs later." *N.J.S.A.* 3B:12A–4a(6). Meanwhile the child's parents remain obligated to pay child support, *N.J.S.A.* 3B:12A–4a(3), and retain the right to visitation, *N.J.S.A.* 3B:12A–4a(4), and "to consent to adoption of the child or a name change for the child," *N.J.S.A.* 3B:12A–4a(2).

Another provision of the Act that is the analogue to *N.J.S.A.* 30:4C–15.1 establishes the standards, for the appointment of a kinship legal guardian:

> d. The court shall appoint the caregiver as a kinship legal guardian if, based upon clear and convincing evidence, the court finds that:
>
> > (1) each parent's incapacity is of such a serious nature as to demonstrate that the parents are unable, unavailable or unwilling to perform the regular and expected functions of care and support of the child;
> >
> > (2) the parents' inability to perform those functions is unlikely to change in the foreseeable future;
> >
> > (3) in cases in which DYFS is involved with the child ... (a) [DYFS] exercised reasonable efforts to reunify the child with the birth parents and these reunification efforts have proven unsuccessful or unnecessary; and (b) adoption of the child is neither feasible nor likely; and
> >
> > (4) awarding kinship legal guardianship is in the child's best interests.
>
> [*N.J.S.A.* 3B:12A–6d.]

Although that provision echoes the best interests standards for termination of parental rights found at *N.J.S.A.* 30:4C–15.1, one difference stands out: a kinship legal guardian may only be appointed when "adoption of the child is neither feasible nor likely."[5] Moreover, unlike adoption, "an order or judgment awarding kinship legal guardianship may be vacated by the court prior to the child's 18th birthday if the court finds that the kinship legal guardianship is no longer in the best interests of the child,"

---

[5] *N.J.S.A.* 30:4C–15.3 states:

> The Division of Youth and Family Services shall not be required to file a petition seeking the termination of parental rights if:
>
> a. The child is being cared for by a relative and a permanent plan for the child can be achieved without termination of parental rights....

The dissent apparently understands that provision to supercede the language in the Act that limits the appointment of a kinship legal guardian to those cases in which "adoption ... is neither feasible nor likely." We observe, first, that *N.J.S.A.* 30:4C–15.3 is permissive and that it preceded the Act by about two years. We read *N.J.S.A.* 30:4C–15.3 *in pari materia* with the Act and find that the earlier statute applies when DYFS determines adoption is not possible. *See Mimkon v. Ford*, 66 *N.J.* 426, 433–34, 332 *A.2d* 199 (1975) (interpreting statutes concerning same general subject matter *in pari materia*). *See generally* Norman J. Singer, 2B *Sutherland Statutory Construction* § 51.02 (6th ed. 2000) (discussing rule that legislative provisions which are *in pari materia* "should be construed together").

or if the parent has regained the ability to care for the child and termination of the guardianship is in the child's best interests. *N.J.S.A.* 3B:12A–6f. The Appellate Division in *S.V., supra,* described the salient features of a kinship legal guardianship as follows:

> Such a guardianship is clearly intended to formalize the status of a relative who agrees to take on responsibility for a child, *see N.J.S.A.* 3B:12A–4a(1), and can remain in place throughout the child's minority, *N.J.S.A.* 3B:12A–4a(6). Unlike a judgment terminating parental rights, kinship legal guardianship would not cut off the legal relationship of the parent and child. *N.J.S.A.* 3B:12A–4a(2)-(5). That is, the parent remains entitled to visitation and responsible for child support; she also has the right to seek termination of the guardianship and a resumption of custody if at a later date she is able to provide a safe and secure home for the child. [362 *N.J.Super.* at 87, 826 *A.*2d 821.]

We note, finally, that the Association for Children of New Jersey (ACNJ) has submitted a brief in this matter solely to provide information about the origins and purpose of the kinship legal guardianship statute. ACNJ represents that it "organized the group of advocates in 1999 that drafted the outline of the ... statute which became effective in January 2002," and that the impetus for kinship legal guardianship came from the recognition of "a relative care system in a state of disarray" due to "children being placed in foster homes rather than with relatives in initial placement, [a] lack of standards in assessing relative homes, and [an] inadequacy of financial supports and services." ACNJ further informs us that the Act was passed to bring stability, reliability and consistency to a family care system for children whose parents are unable to care for them; it was not meant to be a substitute for the permanency of adoption but, rather, to provide as much permanency as possible when adoption is not feasible or likely and a relative is willing to care for the child until he or she reaches eighteen or finishes secondary school. We find that the statute, on its face, reflects that view.

Indeed, this Court has long emphasized "New Jersey's strong public policy in favor of permanency." *K.H.O., supra,* 161 *N.J.* at 357, 736 *A.*2d 1246; *see New Jersey Div. of Youth & Family Servs. v. K.M.,* 136 *N.J.* 546, 558, 643 *A.*2d 987 (1994) (reaffirming

"important policy preference for the permanent placement of children"); *In re Guardianship of J.C.*, 129 *N.J.* 1, 26, 608 *A.*2d 1312 (1992) ("[C]hildren have an essential and overriding interest in stability and permanency. . . ."). Beginning with the enactment of the Child Placement Review Act in 1978, *N.J.S.A.* 30:4c–50 to – 83, and the passage of the federal Adoption Assistance and Child Welfare Act of 1980, 42 *U.S.C.* §§ 670 *et seq.* (AACWA), providing permanency for children when efforts to reunite families fail has been a major underpinning of the child welfare system. The AACWA identified permanency for children as the programmatic goal of the State once it intervenes in the family due to parental abuse or neglect of a child. With the passage of the federal Adoption and Safe Families Act in 1997, Congress reemphasized the importance of permanency by shortening the timeframe within which each child's permanency goal must be achieved. 42 *U.S.C.* § 675(5)(c). Those statutes provide the public policy framework within which the "best interests of the child" and the termination of parental rights standards of *N.J.S.A.* 30:4C–15.1a are applied.

## II.

■■■■ On appeal, a reviewing court must determine whether a trial court's decision in respect of termination of parental rights was based on clear and convincing evidence supported by the record before the court. That review is limited, however, and a trial court's factual findings "should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice." *In re Guardianship of J.N.H.*, 172 *N.J.* 440, 472, 799 *A.*2d 518 (2002) (quoting *In re Guardianship of J.T.*, 269 *N.J.Super.* 172, 188, 634 *A.*2d 1361 (App.Div.1993)). In this case, the Appellate Division reversed the trial court's judgment to terminate the parental rights of P.P. and S.P. as to their daughters J.P. and B.P. We disagree with the Appellate Division and conclude that the evidence amply supports the trial court's decision that termination of parental rights is in the best interests of J.P. and B.P. pursuant to *N.J.S.A.* 30:4C–15.1a.

Briefly, it is clear from the record before the trial court that P.P. and S.P. have been unable to provide for their children in the past due to their significant and longstanding substance abuse histories and to their repeated failure to comply with DYFS recommendations and court orders for services. The Appellate Division and the trial court both recognized that the children have been harmed by their parents' inability to parent. It was uncontroverted that about a year after the children were placed with their grandparents, and around the same time that DYFS filed its complaint seeking guardianship, the parents entered drug treatment programs and were persisting in their rehabilitation efforts at the time of trial approximately ten months later. Yet, neither P.P. nor S.P. had completed their respective programs and vocational training, or had secured stable housing. When the trial took place, despite their first sustained effort to change their lives, the parents were not in a position to care for their children and the experts who testified disagreed as to whether and how soon that could or would occur. The trial court's finding under the statute that "[t]he parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm," *N.J.S.A.* 30:4C–15.1a(2), will not be disturbed on this record.

It also was uncontroverted that DYFS "made reasonable efforts to provide services to help the parent[s]" under *N.J.S.A.* 30:4C–15.1a(3). The issue under subsection a(3) is whether the trial court, in these circumstances, was required to consider kinship legal guardianship as an alternative to termination. The trial court concluded that because grandparent adoption was feasible for both children, kinship legal guardianship was not available. We agree. The plain language of the Act, as well as its legislative history, establish kinship legal guardianship as a more permanent option than foster care when adoption "is neither feasible nor likely" and "kinship legal guardianship is in the child's best interest." *N.J.S.A.* 3B:12A–6d(3)–(4); *S.V., supra,* 362

*N.J.Super.* at 88, 826 *A.*2d 821. Conversely, when the permanency provided by adoption is available, kinship legal guardianship cannot be used as a defense to termination of parental rights under *N.J.S.A.* 30:4C–15.1a(3).

### III.

In this case, J.P., who is over five years old, has resided with her paternal grandmother since birth. B.P., who is almost four, has never been in the custody of either parent. At the time of trial, despite a desire for reunification, the parents were unable to care for their children and were uncertain as to when they would be able to assume parental roles. On those facts, the trial court properly terminated the parental rights of P.P. and S.P. Moreover, we were informed by DYFS prior to oral argument that

[a]n updated evaluation of P.P. and S.P. by Dr. Dyer reveals that, as at the time of trial, neither P.P. nor S.P. currently is able to independently (or jointly) care for the children, even though they both have continued to progress in their respective recovery efforts.

We also understand that M.B. "remains committed to adopting B.P.," and that, based on a more recent bonding evaluation, Dr. Dyer believes "it continues to be in B.P.'s best interests to remain in the permanent care of her maternal grandparents." As for J.P., however, a "unique . . . relationship . . . has developed between [the child] and her biological parents . . . such that adoption may not serve her best interests." Indeed, E.P., who has fostered that relationship, "has been wavering in her adoption commitment."

The unusual circumstances presented by this case remind us of our disposition in *In re Guardianship of J.N.H., supra,* 172 *N.J.* at 479, 799 *A.*2d 518, wherein the Court allowed a parent to reopen a termination decision because she had finally turned her life around after many years of failed attempts and, in the interim, the adoption had not been completed and the child was not thriving. We are constrained by the new information provided through DYFS to rule substantially as has the Appellate Division, and to remand for further "evaluation of the mother and father"

and consideration of any change in respect of the grandparents' wishes vis-a-vis adoption. If P.P. and S.P. are not fit now to parent their children, the trial court should not consider kinship legal guardianship unless either (or both) of the grandparents decline to adopt.

## IV.

The judgment of the Appellate Division is affirmed as modified. This matter is remanded for further proceedings consistent with this opinion.

Justice WALLACE, concurring in part, dissenting in part.

Termination of parental rights issues are extremely difficult. Each case requires a delicate balance between the overlying constitutional considerations of the right of a parent to care and provide for one's child, and "the State's *parens patriae* responsibility to protect the welfare of children." *In re Guardianship of K.H.O.*, 161 *N.J.* 337, 347, 736 *A.2d* 1246 (1999). That balance is struck "through the best interest of the child standard." *Ibid.* The Legislature adopted that standard, which was set forth by this Court in *New Jersey Div. of Youth & Family Servs. v. A.W.*, 103 *N.J.* 591, 512 *A.2d* 438 (1986), for the termination of parental rights. As codified, the standard provides that parental rights may be terminated upon a showing by clear and convincing evidence that:

(1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his foster parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[*N.J.S.A.* 30:4C–15.1a.]

Here, the focus is essentially on the third prong; thus, we are concerned with whether there was clear and convincing evidence that DYFS sufficiently considered alternatives to termination of parental rights. Before explaining why I agree with the Appellate Division that DYFS did not, some further background is required.

Initially, I approach this case with the admonition that "all doubts must be resolved against termination of parental rights." *K.H.O.*, *supra*, 161 *N.J.* at 347, 736 *A.2d* 1246. In many cases, the evidence is overwhelming that the termination of parental rights is in the best interest of the child. However, in the situation where a grandparent or a close relative is the caregiver, our case law provides greater flexibility. In *A.W.*, *supra*, the Court expressly recognized that a common alternative to termination of parental rights is placement with a relative. 103 *N.J.* at 609, 512 *A.2d* 438. In reaching that conclusion, the Court quoted a law review article to the effect that:

> When a child is placed with a relative, termination is both unnecessary and unwise unless the relative wishes to adopt the child or is unwilling to provide long-term care. As long as the relative is willing to provide care until the parents can resume custody, the child's need for stability and attachment are satisfied. In fact, initiating termination might place the relative in the awkward position of having to act against the parents.
>
> [*Ibid.* (quoting Wald, *State Intervention on Behalf of "Neglected" Children: Standards for Removal of Children from Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights*, 28 *Stan. L.Rev.* 623, 697 (1976)).]

The Legislature reached that same conclusion and expressly gave DYFS discretion not to file a petition seeking the termination of parental rights if "[t]he child is being cared for by a relative and a permanent plan for the child can be achieved without termination of parental rights." *N.J.S.A.* 30:4C–15.3a.

In the present case, the Appellate Division canvassed the record and found insufficient reasons "why a permanent plan for the children could not be achieved without termination of parental rights." I agree.

The children have been cared for consistently by their grandparents. J.P., since she was twenty months old, has been with her

paternal grandmother, and B.P., since birth, has been with her maternal grandmother. Under those circumstances, an appropriate alternative to termination of parental rights may be kinship legal guardianship. *N.J.S.A.* 3B:12A–1 to –7. This is "another alternative, permanent placement option, beyond custody, without rising to the level of termination of parental rights, for caregivers in relationship where adoption is neither feasible nor likely." *N.J.S.A.* 3B:12A–1c. A kinship legal guardian is a caregiver

> who is willing to assume care of a child due to parental incapacity, with the intent to raise the child to adulthood, and who is appointed the kinship legal guardian of the child. . . . A kinship legal guardian shall be responsible for the care and protection of the child and for providing for the child's health, education and maintenance.
>
> [*N.J.S.A.* 3B:12A–2.]

Kinship legal guardianship is different from termination of parental rights in that: (1) the birth parent "retains the authority to consent to the adoption of the child or a name change for the child"; (2) the birth parent remains obligated to pay child support; and (3) the birth parent maintains the right to enforce a visitation agreement. *N.J.S.A.* 3B:12A–6e. In addition, kinship legal guardianship does not destroy any rights the child may have "relating to inheritance or eligibility for benefits or insurance." *Ibid.*

In my view, DYFS and the law guardian failed to recognize and investigate whether a permanent plan could be developed with the present relative caregivers without the necessity of termination of parental rights. Further evaluation and efforts by DYFS may reveal that this is an appropriate case for kinship legal guardianship. Moreover, because there are separate grandparents caring for different children, it may be that kinship legal guardianship may be appropriate for one child but not for the other. Simply put, the record does not support the conclusion that DYFS proved by clear and convincing evidence that it pursued alternatives to termination of parental rights.

To be sure, the wisdom of the Appellate Division holding has been borne out by developments after that decision. Prior to oral

argument, DYFS informed the Court that although the maternal grandmother remains committed to adopting B.P., the paternal grandmother no longer commits to the adoption of J.P. DYFS added that an updated bonding evaluation conducted by Dr. Dyer revealed that the "unique nature of the relationship that has developed since the trial of this matter between J.P. and her biological parents is such that adoption may not serve her best interest." Consequently, DYFS advised that the petition before the Court as to J.P. may be moot.

In sum, given the history of this case, including the continuing affectionate relationship between the parents and their children, the progress of the parents in their respective recovery efforts, the successful visitation between the parents and their children, and the uninterrupted relative placements, greater consideration should have been given to a permanent plan without the necessity of termination of parental rights.

Because the majority recognizes that changed circumstances requires the Court to conclude "substantially as has the Appellate Division and to remand for further 'evaluation of the mother and father' and consideration of any change in respect of the grandparents' wishes vis-à-vis adoption," I concur in the result.

*For affirmance as modified/remandment*—Chief Justice PORITZ and Justices LaVECCHIA, ZAZZALI and ALBIN—4.

*For concurrence in part/dissent in part*—Justices VERNIERO and WALLACE—2.