# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1990-22
A-1991-22

NEW JERSEY DIVISION OF CHILD PROTECTION AND PERMANENCY,

Plaintiff-Respondent,

v.

M.B.T. and R.P.,[1]

Defendants-Appellants.

---

IN THE MATTER OF THE GUARDIANSHIP OF A.L.T. and J.L.T., minors.

---

Submitted April 2, 2025 – Decided April 22, 2025

Before Judges Mayer and Puglisi.

---

[1] We use initials and pseudonyms to protect the parties' privacy. R. 1:38-3(d)(12).

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FG-13-0031-22.

Jennifer N. Sellitti, Public Defender, attorney for appellant M.B.T. (Catherine Reid, Designated Counsel, on the brief).

Jennifer N. Sellitti, Public Defender, attorney for appellant R.P. (Bruce P. Lee, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Meaghan Goulding, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minors A.L.T. and J.L.T. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Jennifer M. Sullivan, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendants M.B.T. (Mia) and R.P. (Ray) are the biological mother and father of twins, A.L.T. (Ann) and J.L.T. (Jack), born in 2019. In these consolidated cases, defendants appeal from March 2, 2023 judgments of guardianship terminating their parental rights to Ann and Jack after a trial. Defendants also appeal from a July 24, 2024 order determining post-trial changed circumstances had no effect on the March 2, 2023 judgments of guardianship. We affirm all orders on appeal.

We recite the facts from the trial record and Judge Teresa Ann Kondrup-Coyle's comprehensive forty-two-page written decision filed on March 8, 2023. We presume the parties are familiar with the factual and procedural background of these matters and provide a summary of the facts to give context to our decision.

On August 6, 2020, plaintiff New Jersey Division of Child Protection and Permanency (Division) removed the twins, age nine months at the time, from Mia's care because she left them unattended on the front porch of a man Mia mistakenly believed to be the children's biological father. The police arrested Mia and charged her with child endangerment. The Division placed the children with Mia's sister, R.T. (Ruth).

Psychological evaluations revealed Mia suffered from mental illness, which inhibited her ability to regulate her emotions and manage her substantial anger issues. The psychological evaluations also indicated Mia failed to take responsibility for her actions and was unable to perform the regular and expected function to care for and support her children. The Division's expert, Dr. David Brandwein, testified Mia was prone to "[i]nappropriate, intense anger . . . and . . . this behavior was potentially dangerous to herself and dangerous to her children." Based on the various evaluations undertaken at the Division's request,

Mia was diagnosed with depression, and personality disorder with borderline and paranoid features. The evaluators noted Mia lacked any insight into her mental illness and other conditions and exhibited frequent agitation and explosive anger.

Throughout the Division's involvement, Mia engaged in angry outbursts directed toward the children's physician, the Division's staff, and family members who supervised Mia's visits with the twins. Often, the twins were present during Mia's episodes of volatile rage. On at least one occasion, Mia directed her ire at the twins. According to the testimony, security personnel frequently escorted Mia from the building during supervised visits with the twins due to Mia's hostile and aggressive behaviors.

Further, Mia failed to comply with services offered by the Division, missed visits with the children, and tested positive for cocaine and marijuana. Several doctors who evaluated Mia recommended she participate in various counseling and therapeutic programs and receive medication to address her depression, anger, mood instability, irritability, and poor impulse control. Mia failed to complete the programs because she either left the program on her own or was discharged by the program for non-compliance. Although doctors

prescribed medication for Mia's depression and mood instability, she did not take the medications regularly.

Because Mia believed another man fathered the children, Ray initially had no contact with the twins. After paternity testing revealed the man identified by Mia did not father the twins, she subsequently identified Ray as the putative father.

A year after Mia identified Ray as the father of the twins, he eventually complied with the Division's request for a paternity test. Despite the paternity test confirming Ray as the twins' father, Ray requested a second paternity test and continued to question the positive results throughout the litigation. Throughout the litigation, Ray rarely visited the children.

Dr. Brandwein, who evaluated Ray on behalf of the Division, testified Ray lacked any plan for custody and care of Ann and Jack. Further, because Ray did not regularly visit the children, Dr. Brandwein explained the twins did not know him "from a psychological perspective."

Judge Kondrup-Coyle conducted the guardianship trial over the course of four days in October 2022. Mia did not attend any of the trial days. Ray attended two days of the trial.

After hearing the testimony and reviewing the evidence, Judge Kondrup-Coyle rendered a comprehensive and detailed written decision. The judge terminated defendants' parental rights, finding defendants abandoned the children and failed to remedy the issues that led to the twins' removal.

Regarding Mia, the judge found she failed to address her mental health and substance abuse issues and did not comply with the services offered by the Division or was discharged for non-compliance from the programs she attended. Based on the testimony of the Division's experts, the judge concluded Mia suffered from mental illness, impulse control issues, and other serious behavioral concerns. The judge found Mia was unable to independently care for the twins because she was unable or unwilling to learn new skills to parent Ann and Jack. The judge also concluded Mia lacked any insight into her behaviors, including her low tolerance level and the negative impact her behaviors had on the children.

Regarding Ray, the judge found he continued to challenge paternity despite the positive test result. The judge noted Ray visited Ann and Jack only six times after the paternity test confirmed he fathered the children. Based on the testimony, the judge explained Ray made little effort to form a relationship with the children. Further, Ray expressed uncertainty with respect to caring for

Ann and Jack. At some point, Ray stated he intended to move to Georgia to care for his four children from a different relationship. According to the testimony of a Division adoption caseworker, Ray explained "he was not in a place to be an independent caretaker of the children and that, quite frankly, that he did not want to be."

Based on the experts' testimony, the judge found Ann and Jack were not "sufficiently bonded" with defendants. Further, the judge concluded Mia's mental health, anger issues, and other behavioral problems, as well as Ray's absences, caused harm to the children. She found neither parent expressed a willingness or ability to remedy the harms that led to the Division's removal of the children. Based on the record, the judge concluded neither parent demonstrated an ability to provide a safe and stable home for the twins. Additionally, the judge determined the twins had limited familiarity with Mia and no familiarity with Ray.

The judge also found no feasible alternatives to termination of defendants' parental rights. The judge explained Ruth had a secure bond with the twins, loved them, and wanted to adopt them. The judge stated Ruth understood the difference between Kinship Legal Guardianship (KLG) and adoption and preferred adopting the twins. Because Mia failed to address her mental health

and other issues and continued to display "patterns of anger, aggression, and violence," the judge concluded KLG was "an unacceptable alternative to [termination] because of the legitimate, ongoing, and unresolved safety concerns to [Ruth] and children if [Ruth] was obligated to continue to provide access to the children."

Based on the uncontroverted evidence, Judge Kondrup-Coyle found termination of defendants' parental rights would not do more harm than good to the children. The judge also found termination would allow Ruth to adopt the twins and provide permanency for the children. The judge entered March 2, 2023 judgments of guardianship terminating defendants' parental rights to Ann and Jack.

Defendants filed separate notices of appeal on March 8, 2023. In a March 9, 2023 order, we consolidated defendants' appeals. The same day defendants appealed, the Division learned Ruth's son drowned while on a family vacation in Florida. Five months later, the Division discovered the authorities in Florida planned to charge Ruth in connection with the death of her son. Because Ruth's arrest was imminent, the Division placed Ann and Jack with Mia's other sister, M.T. (Molly).

Based on the changed placement of Ann and Jack with a different resource parent, Mia moved to vacate the judgment of guardianship and requested a new trial. Alternatively, Mia sought a remand to file a Rule 4:50-1 motion for relief from judgment. The Division and the children's Law Guardian cross-moved for a limited remand to consider whether the placement of the twins with Molly based on Ruth's changed circumstances affected prongs three and four of the best interests test under N.J.S.A. 30:4C-15.1(a). At the time of the cross-motions, the twins were living with Molly, who had regular contact with the children since the Division initiated the litigation.

In an order dated October 30, 2023, we denied Mia's motion to vacate the judgment or, in the alternative, to remand to allow the filing of a motion under Rule 4:50-1. In separate October 30, 2023 orders, we granted the cross-motions filed by the Division and the Law Guardian, temporarily remanding the matters for the trial judge to "consider whether changed circumstances ha[d] any effect upon the terms of the March 2, 2023 [judgments of guardianship] and, if so, . . . enter a new order."

In accordance with our remand orders, Judge Kodrup-Coyle conducted a remand trial on July 23 and 24, 2024. Mia, proceeding pro se, appeared on the first day of remand trial but not the second day. Ray, represented by counsel,

did not appear at the remand trial. On behalf of the Division and Law Guardian, the judge heard testimony from Dr. Brandwein, Dr. Alison Strasser Winston, a clinical and forensic psychologist, a Division Supervisor, a Division Home Study Writer, and Molly. Mia and Ray presented no witnesses or evidence at the remand trial. However, Ray's attorney extensively cross-examined the Division's witnesses.

In a July 24, 2024 oral decision, notwithstanding the change in the placement of the children from Ruth to Molly, the judge found there were no alternatives to termination, termination of defendants' parental rights would not do more harm than good, and the placement of the twins with Molly did not impact the permanency plan for the children.

The judge found the testimony of the expert witnesses on remand credible. The judge also incorporated the Division's closing argument during the remand trial "for purposes of the entire history of the case, the dates and so forth, of the initial matters and the remands."

The judge determined Ray made only a limited appearance during the guardianship trial and never participated in the remand trial. Accordingly, the judge found Ray "absenced himself from the entire case." The judge found Ray did not make himself present [sic] for parenting time or other quality time with

the twins. In fact, Ray contacted Molly not to inquire about the children but to ask if Molly filed an application for child support. The judge found throughout the entirety of the litigation, Ray made no effort to connect with the twins.

Regarding Mia, who insisted on representing herself during remand trial despite the judge cautioning her against doing so, the judge found Mia did not participate in most of the trial proceedings and did not hear the testimony from the Division's witnesses, including the expert witnesses, regarding the best interests of the children. The judge noted Mia did not conduct any cross-examination during the remand trial and did not proffer any testimony on her own behalf.

The judge, paraphrasing Dr. Brandwein's testimony at the remand trial, stated that despite the tragic death of Ruth's son, the family came together because that "is what families do when families function well." Even before Ruth's son died, Molly spent quality time, including overnights, with the twins so the children maintained a familial structure despite the changed placement. Drs. Brandwein and Winston opined Molly provided "excellent care" and a "real sense of structure" for the twins.

Judge Kondrup-Coyle found Molly's testimony at the remand hearing very credible. Molly allowed Ruth to see the children but only with supervision. The

judge explained "this placement was a blessing" because the "children could be somewhere so familiar to them . . . not just because of family membership but because of constant access to [Molly's] home over the course of the couple of years that [the twins] were with [Ruth] before they were full-time with [Molly]." Further, the judge noted Molly's house was larger than Ruth's house and the twins had their own bedroom in Molly's home.

Regarding Molly's understanding of KLG versus adoption, the judge noted Molly's preference to adopt the twins "was very clear and informed." The judge found any hesitancy in Molly's response to questions regarding KLG was attributable to Molly's confusion during defense counsel's cross-examination. Notwithstanding Molly's lack of understanding of legal terms as a non-lawyer, the judge stated Molly's clear understanding of the difference between KLG and adoption was "informed and unequivocal." Molly expressly told the judge she wanted to adopt the twins because they needed permanency and Molly needed to be able to make decisions concerning the children. The judge concluded "KLG [was] absolutely unsupported in this situation" because Mia has "mental health issues [that] manifest themselves in a way where she is argumentative, aggressive, [and] intimidating." The judge found KLG unsuitable because it

would force Molly "to interact with th[at] kind of behavior and it's inappropriate, and it's not appropriate to the children."

The judge rejected Ray's concern that Molly would allow Ruth to move into Molly's house with the twins. The judge concluded Molly wanted "some quiet enjoyment, [to] parent the[] children, [and] do what she has to do" and was not seeking to have Ruth move into her home. Molly testified Ruth was not living with her and Ruth stayed either at their father's house or a girlfriend's house.

Consistent with our remand order, Judge Kondrup-Coyle fully considered KLG based on the changed placement of the twins from Ruth to Molly. The judge explained she was "satisfied [Molly] gave a full, knowledgeable, informed decision" regarding adoption of the twins rather than KLG. Based on the evidence at the initial trial and the remand trial, Judge Kondrup-Coyle found "KLG [was] no better an option now than it ever was" for the reasons she explained in her written decision after the guardianship trial and oral decision after the remand trial. The judge concluded "as to the remand issues, there's no alternative to termination of parental rights . . . and that the move to [Molly was] in [the twins'] best interest." At the conclusion of the remand trial, the judge again found the Division satisfied its burden under the best interests of the

children test clearly and convincingly based on the evidence adduced at both trials.

Mia and Ray appealed the July 24 order. On appeal, Ray argues: (1) the Division failed to prove it satisfied prongs one and two of the best interests test; (2) Dr. Brandwein's opinion that Ray had no plan to parent the children constituted impermissible net opinion; (3) KLG was preferable to termination because Ray could continue to pay child support to Molly under a KLG plan; and (4) the Division failed to clearly and convincingly demonstrate termination would not do more harm than good because Dr. Brandwein did not conduct any psychological testing as to Molly.

On appeal, Mia does not contest the judge's findings on prongs one and two. Rather, she contends: (1) the judge impermissibly considered Mia's mental health in ruling out KLG; (2) the judge ignored the preference for KLG; (3) the judge relied exclusively on Molly's preference for adoption; (4) Molly's preference for adoption was not unequivocal; and (5) the judge violated Rule 1:7-4 because she incorporated by reference facts from the Division's summation.

Additionally, Mia and Ray both contend the judge demonstrated bias, depriving them of their right to due process. In support of their argument, they

highlight certain rulings and remarks by the trial judge, as well as her cross-examination of Molly. We reject defendants' arguments.

## I.

The termination of a parent's right to raise their children is a matter of constitutional magnitude. See In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). However, those rights are "not absolute" and are limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 447 (2012).

"Children have their own rights, including the right to a permanent, safe and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). Our courts have acknowledged "the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." Ibid. A parent's interest must, at times, yield to the State's obligation to protect children from harm. See N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009).

When seeking termination of parental rights, the Division must satisfy the four prongs under N.J.S.A. 30:4C-15.1(a):

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

The foregoing prongs are "not discrete and separate" but rather "overlap to offer a full picture of the child's best interests." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 554 (2014). The Division must prove each prong through "clear and convincing evidence." N.J. Div. of Child Prot. & Perm. v. D.H., 469 N.J. Super. 107, 15 (App. Div. 2021).

We accord substantial deference to a trial judge's opportunity to observe witnesses first-hand and to evaluate their credibility. N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014). "Our general deference on appeal is

also informed by the Family Part judge's 'feel of the case[,]'" D.H., 469 N.J. Super. at 116 (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)), and by the Family Part's "special expertise in matters related to the family." F.M., 211 N.J. at 448. Accordingly, we defer to the trial judge's factual findings "and uphold those findings if they are grounded in substantial and credible evidence in the record." N.J. Div. of Child Prot. & Perm. v. D.C.A., 256 N.J. 4, 19 (2023).

We will reverse a Family Part judge's decision on appeal only if the judge's findings were "so wholly unsupportable as to result in a denial of justice." N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004); see also N.J. Div. of Child Prot. & Perm. v. D.A., 477 N.J. Super. 63, 80 (App. Div. 2023). We review the trial judge's legal conclusions de novo. See R.G., 217 N.J. at 552-53; see also D.C.A., 256 N.J. at 19 (acknowledging we give no deference to the trial court's interpretation of N.J.S.A. 30:4C-15.1(a)).

## II.

Under the first prong, "the Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Dep't of Child. & Fams. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 352). The Division need not "wait 'until a child is actually

irreparably impaired by parental inattention or neglect.'" F.M., 211 N.J. at 449 (quoting In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999)).

Under prong two, the Division must prove by clear and convincing evidence that the "parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2). "[T]he inquiry centers on whether the parent is able to remove the danger facing the child." F.M., 211 N.J. at 451 (citing K.H.O., 161 N.J. at 352); see also D.C.A., 256 N.J. at 27 (finding prong two, as amended in 2021, was intended "to ensure that parental fitness–not the child's bond with resource parents–is the core inquiry when a judge considers the best interests standard's second prong in a termination of parental rights case").

Prong three, N.J.S.A. 30:4C-15.1(a)(3), requires the Division to demonstrate reasonable efforts to reunite the family and the court to "consider[] alternatives to termination of parental rights." "[A]ssessment of relatives is part of the Division's obligation to consult and cooperate with the parent in developing a plan for appropriate services that reinforce the family structure." N.J. Div. of Youth & Fam. Servs. v. K.L.W., 419 N.J. Super. 568, 583 (App. Div. 2011).

Under this prong, an alternative to termination of parental rights is KLG. KLG allows a relative to become the child's legal guardian and commit to care for the child until adulthood, without stripping parental rights. P.P., 180 N.J. at 508. The Legislature created this arrangement because it found "that an increasing number of children who cannot safely reside with their parents are in the care of a relative or a family friend who does not wish to adopt the child or children." N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 222-23 (2010).

Prior to amending the statute in 2021, KLG was considered "a more permanent option than foster care when adoption '[was] neither feasible nor likely.'" P.P., 180 N.J. at 512 (quoting N.J.S.A. 3B:12A-6(d)(3) to (4)). On July 2, 2021, the Legislature enacted L. 2021, c. 154, which eliminated the KLG requirement that adoption be "neither feasible nor likely." See P.P., 180 N.J. at 512 (quoting N.J.S.A. 3B:12A-6(d)(3) to (4)). Under the amended statute, KLG remains a valid defense to the termination of parental rights. See D.H., 398 N.J. Super. at 341.

Prong four, N.J.S.A. 30:4C-15.1(a)(4), "serves as a fail-safe against termination even where the remaining standards have been met." N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 609 (2007). "The question

ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with th[e] parent." E.P., 196 N.J. at 108. In making that determination under the fourth prong, the court may consider evidence regarding the bond between the child and the resource parents. See D.C.A., 256 N.J. at 28 (holding the 2021 amendment to N.J.S.A. 30:4C-15.1(a) "precludes a court from considering the bond between a child and resource parents under the second prong of the best interests standard but does not bar such evidence when the court addresses that standard's fourth prong").

III.

As explained in Judge Kondrup-Coyle's comprehensive opinion, the record contains adequate substantial and credible evidence supporting the decision to terminate defendants' parental rights under N.J.S.A. 30:4C-15.1(a). We need not repeat the judge's detailed and extensive opinion other than to state Judge Kondrup-Coyle thoroughly addressed all four prongs of the statutory best interests of the children test. Mia and Ray demonstrated an inability to care for Ann and Jack – Mia due to her unaddressed mental health and behavior issues and Ray due to his complete lack of participation in the twins' lives. The

testimony proffered by the Division's witnesses, including expert witnesses, was not rebutted by either parent.

Regarding prong two, relying on the experts' testimony, Judge Kondrup-Coyle found delays in achieving permanency for Ann and Jack would cause enduring harm. According to the expert witnesses, neither parent could independently care for the twins and both parents were unwilling or unable to remedy the harm they caused to the children. We are satisfied the judge's findings as to prong two are amply supported by the record.

We reject the argument that Dr. Brandwein's conclusion Ray lacked a plan resulting in harm to the children constituted an impermissible net opinion. Ray consented to the admission of Dr. Brandwein's report and did not object to his testimony as an expert witness. Additionally, Ray's attorney vigorously cross-examined Dr. Brandwein regarding Ray's plan for the children. On cross-examination, Dr. Brandwein testified Ray presented "no plan." Because Ray never testified at trial, there was no evidence for the judge to find Ray had any plan for the twins. As the judge held, the absence of any plan for the children proffered by Ray caused the twins to suffer harm.

We also note this matter proceeded as a bench trial. Even if Dr. Brandwein's conclusion regarding Ray's lack of plans for the twins constituted

a net opinion, we are satisfied the judge gave the doctor's opinion appropriate weight and considered the other trial evidence in rendering her decision. Moreover, the judge did not rely exclusively on Dr. Brandwein's expert opinion in terminating Ray's parental rights. The judge cited Ray's persistent doubts as to the result of the paternity test, failure to communicate with the Division, sporadic and infrequent visits with Ann and Jack, and his own testimony that "he was not in a place to be an independent caretaker of the children."

Regarding prong three, neither party argues the Division failed to make reasonable efforts to provide services. Defendants focus their arguments on the second part of the third prong, whether there were alternatives to termination.

Regarding alternatives to termination, Judge Kondrup-Coyle followed our remand instructions and considered whether her initial termination decision was impacted by a change in circumstances. See Tomaino v. Burman, 364 N.J. Super. 224, 232 (App. Div. 2003) ("It is beyond dispute that a trial judge has the responsibility to comply with pronouncements of an appellate court."). As a result of Ruth's arrest for the drowning death of her son, the Division placed the twins with Molly. Given the change in placement, we remanded for the judge to decide if that change impacted her termination decision. The judge faithfully and diligently followed our remand instructions.

On remand, after hearing testimony from the Division's witnesses, the judge concluded the Division adequately explored alternatives to termination before placing Ann and Jack with Molly. Because the twins were familiar with Molly when they lived with Ruth, the judge concluded the family structure remained the same for the children despite the change in placement. Further, the judge determined Molly understood the difference between KLG and adoption and explained, based on the circumstances, why Molly rejected KLG in favor of adopting the twins.

Additionally, the judge found Mia's mental illness and violent behaviors impacted the feasibility of KLG as an alternative to termination. Mia's troubling behaviors had not been remediated, as demonstrated by her explosive courtroom outburst just prior to the start of the remand trial. On this record, there was substantial credible and unrefuted evidence supporting Judge Kondrup-Coyle's determination under prong three that KLG was an inappropriate alternative plan to termination. There was ample evidence that Molly clearly and unequivocally explained her reasons for wishing to adopt Ann and Jack instead of proceeding with KLG given Molly's concerns for the twins' safety and her own safety if a KLG plan was approved.

Regarding the fourth prong, the judge did not abuse her discretion in finding termination of defendants' parental rights would not do more harm than good. The Division proffered unrebutted testimony from expert witnesses who evaluated the children's relationship with defendants and with Molly. "The crux of the fourth statutory subpart is the child's need for a permanent and stable home, along with a defined parent-child relationship." N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 226 (App. Div. 2013). Relying on the experts' testimony, the judge concluded the twins had a secure and attached bond with Molly. Additionally, the judge noted Molly planned to maintain the children's connection to family if appropriate.

We reject defendants' contention that Judge Kondrup-Coyle demonstrated bias against them during the remand trial. "A judge must conduct a trial in a fair and impartial manner, refraining from remarks that might prejudice a party or might influence the minds of the jury." Mercer v. Weyerhaeuser Co., 324 N.J. Super. 290, 297-98 (App. Div. 1999) (citing Cestero v. Ferrara, 110 N.J. Super. 264, 273 (App. Div. 1970)). The "concern over judicial involvement," however, is "less acute in the context of bench trials." L.M.F. v. J.A.F., Jr., 421 N.J. Super. 523, 537 (App. Div. 2011) (quoting State v. Taffaro, 195 N.J. 442, 451 (2008)). "In a bench trial such as this, a judge may examine witnesses to

clarify testimony, aid the court's understanding, elicit material facts, and assure the efficient conduct of the trial." D.M.R. v. M.K.G., 467 N.J. Super. 308, 320-21 (App. Div. 2021).

"Central to a judicial proceeding is the right to a fair trial before an impartial judge." State v. Storm, 141 N.J. 245, 252 (1995). "Judges must preserve the integrity of the judicial process, even from the appearance of impropriety." A.M.C. v. P.B., 447 N.J. Super. 402, 422 (App. Div. 2016). A "judge's failure to conduct the trial with impartiality" warrants reversal. N.J. Div. of Child Prot. & Permanency v. A.M.W., 480 N.J. Super. 496, 502 (App. Div. 2024). Accordingly, "a trial judge must take special care to craft questions in such a manner to avoid being perceived as an advocate for any side of a dispute." L.M.F., 421 N.J. Super. at 537.

Defendants argue the judge's "rulings, utterances, and hostility" demonstrated the judge "was biased against" them. However, we discern no hostility or bias in the judge's rulings during the remand trial. The judge denied certain discovery requests and precluded certain questions at the remand trial because the requests and questions exceeded the scope of our remand order. The focus of the remand trial was on the placement of the twins with Molly. We discern no abuse of discretion in the judge's denial of irrelevant discovery

requests and presentation of evidence and questions which exceeded the scope of our remand.

Having reviewed the entire record, we find defendants failed to demonstrate the judge displayed any bias or partiality. We are satisfied the judge's rulings throughout the trial were balanced and reasonable, her direct questioning of Molly on remand was neutral and designed to confirm Molly's testimony, and her statements regarding Ray's absence during the trial were not prejudicial.

To the extent we have not addressed any of defendants' other arguments, they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division