# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1820-18T2
                A-1821-18T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

L.J. and C.G.,

      Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.R.,

      a Minor.

_____

Argued telephonically June 2, 2020 –
Decided July 2, 2020

Before Judges Accurso, Gilson and Rose.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FG-13-0061-18.

Cecilia M.E. Lindenfelser, Designated Counsel, argued the cause for appellant L.J. (Joseph E. Krakora, Public Defender, attorney; Robyn A. Veasey, Deputy Public Defender, of counsel; Cecilia M.E. Lindenfelser, on the briefs).

Daniel Anthony DiLella, Designated Counsel, argued the cause for appellant C.G. (Joseph E. Krakora, Public Defender, attorney; Robyn A. Veasey, Deputy Public Defender, of counsel; Daniel Anthony DiLella, on the briefs).

Salima E. Burke, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Salima E. Burke, on the brief).

Melissa R. Vance, Assistant Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney;  Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, of counsel and on the brief).

PER CURIAM

In this consolidated matter, defendants L.J. (Father) and C.G. (Mother) appeal a Family Part judgment terminating their parental rights to their biological son J.R. (John),[1] born in May 2016.  Mother argues the Division of Child Protection and Permanency failed to establish all four prongs of the best

---

[1]  We use initials and pseudonyms to protect the privacy of the parties, see R. 1:38-3(d)(12), and for ease of reference.

interests standard under N.J.S.A. 30:4C-15.1(a)(1)-(4). Father primarily focuses on the requirements of the third prong, emphasizing the Division failed to consider alternatives to termination. John's law guardian joins the Division in urging us to affirm. Based on our review of the record and applicable law, we are satisfied the evidence in favor of the guardianship petition supports the termination of defendants' parental rights. See N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007). Accordingly, we affirm.

I.

The guardianship trial spanned six days, during which the Division presented the testimony of three caseworkers, and its expert psychologist, Lori Lessin, Ph.D., who performed the psychological evaluation of Mother and bonding evaluations of John with Mother and his resource parents. The law guardian presented the testimony of its expert psychologist Dr. Maureen Santina, Ph.D., who observed a visit between John and Father at the county jail. Defendants did not testify; Father presented the testimony of three relatives to challenge the merits of the Division's "rule outs." The parties also moved into evidence hundreds of documents, including the caseworkers' reports, bonding evaluations, and rule-out letters.

John has never lived with his parents. The Division became involved with Mother and John the day after the child was born, following a referral from the hospital that cited concerns for Mother's well-being, including her impending homelessness. Mother initially named her boyfriend, J.R. (Jim), as John's biological father, although she and Jim suspected another man – whom mother refused to identify – could be John's father.

Mother acknowledged a history of mental illness, including psychiatric hospitalizations, but said she was not presently receiving treatment. Mother agreed to a safety protection plan, whereby she and John would be supervised by a family member or friend. The Division considered John's maternal grandmother, and several friends proposed by Mother and Jim, but none was a viable option. Mother agreed that, upon John's release from the hospital, he could stay with her friend, Co. L. (Colleen), without Mother. Unable to implement a safety protection plan to enable Mother and John to live together, the Division sought and received custody of John, and placed him with Colleen upon his release from the hospital.

Six months later, John was placed with Colleen's parents (resource parents), with whom he has lived ever since. Although the resource parents

initially were open to kinship legal guardianship,[2] they have since expressed their unequivocal desire to adopt John.

During the course of the litigation, the Division provided a multitude of services to Mother, including psychological evaluations, referrals for mental health services, parenting skills training, supervised parenting time, and financial assistance with transportation. But Mother was inconsistent with her mental health treatment and was psychiatrically hospitalized during the course of the litigation. Mother fluctuated between her desire to kidnap John and "not want[ing] the child." Mother's attendance at visits was inconsistent, missing some visits and arriving late for others. Mother's interactions with John varied: she was often disengaged and failed to respond to his needs. At one point, Mother absented herself from John's life for eight months, failing to notify the Division of her whereabouts. And during Dr. Lessin's psychological evaluation, Mother "abruptly announced that she needed a domestic violence counselor," marking the first time she claimed domestic violence existed in her relationship with Jim.

---

[2] See N.J.S.A. 3B:12A-6(d); see also N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 512-13 (2004) (clarifying that kinship legal guardianship should only be considered when adoption is not possible).

Meanwhile, in mid-July 2016, Mother provided Father's name to the Division, and said he was incarcerated; two weeks later a paternity test confirmed Jim was not John's father. In mid-August, a Division worker met with Father at South Woods State Prison. Father claimed he could be released by March 2018, but he was later sentenced to a twelve-year prison term and was incarcerated at the time of the guardianship trial. Father offered his sister, J.J. (Jessie) as a possible placement for John, but Jessie could not be evaluated until DNA testing later confirmed Father's paternity.

The Division provided Father visitation in prison; arranged for court-ordered psychological and bonding evaluations; and offered counseling and parenting classes. Father's interaction with John during visits was inconsistent; John often became visibly upset on visitation day. Following Dr. Santina's observed visit, she opined the visits had "a harmful emotional impact on J[ohn]." Father refused court-ordered evaluations and claimed he had completed the programs offered by the Division.

Several relative placements were considered by the Division, including Mother's sister, who later withdrew her application. Jessie and Father's niece, R.H., were ruled out following background checks. The Division also considered Father's niece, T.R. (Tara), who twice was ruled out by the Division;

6

appealed those decisions; and ultimately was ruled out because the Division found disruption of John's bond with his resource parents would not be in his best interests. Tara's brother, J.H., was considered and ruled out because he would not commit to the licensing process. In May 2018 – more than two years after John's birth – Father proposed two other relatives: G.D. and K.G., who were ruled out on a best interests basis, and K.G. did not pass the background check.

Based on the evidence adduced at the guardianship trial, the judge considered each prong of the best interests test, and gave careful attention to the importance of permanency and stability for John. As one notable example, the judge credited the expert opinion of Dr. Lessin, noting the psychologist's "very serious concerns with [Mother's] mental health." The judge also recognized the "strong and secure bond" between John and his resource parents. Ultimately, the judge concluded the Division demonstrated by clear and convincing evidence that termination of defendants' parental rights was in John's best interests. N.J.S.A. 30:4C-15.1(a); In re Guardianship of K.H.O., 161 N.J. 337, 347-48 (1999). These appeals followed.

Our review of a judgment terminating parental rights is limited. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014). We are bound to accept the trial court's findings, as long as they are "supported by adequate, substantial, and credible evidence." Ibid. (citing N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)). Additionally, we accord a family court's decision particular deference in view of its "special jurisdiction and expertise in family matters," and because the court is uniquely in a position to evaluate the credibility of the witnesses. Cesare v. Cesare, 154 N.J. 394, 412-13 (1998). We review the trial court's legal interpretations de novo. R.G., 217 N.J. at 552-53.

Parents have a fundamental right to raise their children, and that right is constitutionally protected. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007). "[T]erminations should be granted sparingly and with great caution because they irretrievably impair imperative constitutionally-protected liberty interests and scores of centuries of societal family constructs." R.G., 217 N.J. at 553 (citation omitted). But, a parent's rights are not absolute. Ibid. "Because of its parens patriae responsibility, the State may terminate parental rights if the child is at risk of serious physical or emotional harm or when necessary to protect the child's best interests." Id. at 553-54 (citing N.J. Div. of

Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986)). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009).

To effectuate those concerns, the Legislature created a test for determining when a parent's rights must be terminated in a child's best interests, requiring the Division to prove by clear and convincing evidence the following four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a)(1)-(4).]

The four prongs are not independent of one another. Rather, they "are interrelated and overlapping[,] . . . designed to identify and assess what may be necessary to promote and protect the best interests of the child." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006). Parental fitness is the crucial issue. K.H.O., 161 N.J. at 348. Determinations of parental fitness are very fact sensitive and require specific evidence. Ibid. Ultimately, "the purpose of termination is always to effectuate the best interests of the child, not the punishment of the parent." Id. at 350.

We first consider defendants' overlapping arguments that the trial judge's findings were insufficient to establish the first and second prongs of the best interests test. In particular, Mother contends she did not cause John harm, and the Division hastily ruled out her friend as an appropriate supervisor, thereby preventing her from parenting John. Father claims his imprisonment cannot be a basis for finding he caused harm to John especially where, as here, he proposed relative placements for the child's care. Defendants' arguments are unavailing.

Relevant here, "[w]hen the condition or behavior of a parent causes a risk of harm, such as impermanence of the child's home and living conditions, and the parent is unwilling or incapable of obtaining appropriate treatment for that condition, the first subpart of the statute has been proven." N.J. Div. of Youth

& Family Servs. v. H.R., 431 N.J. Super. 212, 223 (App. Div. 2013); see also N.J. Div. of Youth & Family Servs. v. L.M., 430 N.J. Super. 428, 444 (App. Div. 2013) (holding that a parent's "continued drug use, lack of appropriate housing, and failure to attend treatment, clearly posed a risk to the children" and satisfied prong one of the best interests test).

The second prong "relates to parental unfitness," K.H.O., 161 N.J. at 352. "[T]he inquiry centers on whether the parent is able to remove the danger facing the child." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 451 (2012). This prong is satisfied "by demonstrating that the parent has not cured the problems that led to the removal of the child." H.R., 431 N.J. Super. at 224. "In other words, the issue becomes whether the parent can cease causing the child harm before any delay in permanent placement becomes a harm in and of itself." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 434 (App. Div. 2001); see also N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 512 (2004) (holding that prong two was proven by clear and convincing evidence where the parents repeatedly failed "to comply with [the Division's] recommendations and court orders for services," and "were not in a position to care for their children" at the time of trial).

As is often the case, the trial judge's findings regarding the first prong, informed and overlapped the second. See R.L., 388 N.J. Super. at 88. The judge's prong one and prong two findings not only focused on Mother's pervasive mental health issues and Father's incarceration, but also on defendants' inability to eliminate the harm, despite the Division's efforts to assist them. According to the judge, Mother "refused to comply with services and address [her mental health issues]," which were "still existing" at the time of trial.[3] The judge cited Father's lengthy prison term and refusal to cooperate with the Division. The record supports the judge's findings.

Regarding Mother, we recognize "[m]ental illness, alone, does not disqualify a parent from raising a child." F.M., 211 N.J. at 450. But, the best interests test can be met by expert evidence demonstrating that a parent's mental illness prevents her from meeting a child's daily needs. A.G., 344 N.J. Super. at 436. The Division is not required to "wait to act until a child is actually irreparably impaired by parental inattention or neglect." In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999).

---

[3] As the trial judge observed, Mother had given birth to another child after John was born. That child was removed from Mother's care, but is not a party to the present guardianship complaint or this appeal.

One such need is a stable and safe home, the deprivation of which causes a child psychological harm. See K.H.O., 161 N.J. at 353; D.M.H., 161 N.J. at 379. When mental illness causes risk of harm, such as the inability to maintain a safe environment, and the parent is unwilling or incapable of obtaining appropriate treatment, the first prong has been proven. F.M., 211 N.J. at 450-51. We are satisfied that the record, especially Dr. Lessin's expert testimony, fully supports the judge's finding that Mother's mental illness has prevented – and will continue to prevent – her from providing John a safe home and the nurturing he requires. Moreover, as the judge observed, mother was living in a shelter at the time of trial.

As to Father, our Supreme Court has recognized that although imprisonment alone is insufficient to establish parental unfitness, "particularized evidence of how a parent's incarceration affects each prong of the best-interests-of-the-child standard" can support termination of parental rights of an incarcerated parent. R.G., 217 N.J. at 556. In R.G., the Court found "the Division failed to show by clear and convincing evidence that [the defendant-father's] incarceration caused harm to [the child]" because the father "parented [the child] prior to his incarceration," and remained a part of the

child's life and communicated with the child while incarcerated. 217 N.J. at 559-60.

Father's reliance on R.G. to support his arguments as to the first and second prongs is misplaced. Unlike the defendant in R.G., Father never lived with John, and never cared for or supported the child. As the trial judge correctly noted, Father had not engaged in any services, despite the Division's efforts to assist him. And as Dr. Santina observed, Father's visits with John were harmful to the child. Contrary to Father's assertion, the trial judge's findings of harm and Father's inability to eliminate that harm were not based upon Father's incarceration alone.

Prong three requires the Division to establish it "made reasonable efforts . . . to help the parent correct the circumstances which led to the child's placement outside the home" and considered alternatives to termination of parental rights. N.J.S.A. 30:4C-15.1(a)(3). Mother primarily challenges the first part of the prong; father primarily challenges the second.

In view of the services offered to both defendants, we find insufficient merit in their contentions that the Division failed to make reasonable efforts to assist them to warrant discussion in this written opinion. R. 2:11-3(e)(1)(E). We simply note the reasonableness of the Division's efforts is not measured by

whether those efforts were successful in bringing about reunification of parent and child. D.M.H., 161 N.J. at 393.

We turn instead to Father's claim that the Division failed to properly evaluate his suggested relatives. The Division has a statutory obligation to "search for relatives who may be willing and able to provide the care and support required by the child." N.J.S.A. 30:4C-12.1(a); N.J. Div. of Child Prot. and Permanency v. K.N., 435 N.J. Super. 16, 29 (App. Div. 2014), aff'd as modified, 223 N.J. 530 (2015). There is, however, no presumption in favor of placement with relatives or friends. N.J. Div. of Youth & Family Servs. v. K.L.W., 419 N.J. Super. 568, 580 (App. Div. 2011). The presumption of custodial placement only exists between a child and his biological parents, not a proposed placement with family or a friend. N.J. Div. of Youth & Family Servs. v. J.S., 433 N.J. Super. 69, 82 (App. Div. 2013). The reasonableness of the Division's efforts to consider alternatives to termination is fact sensitive. A.G., 344 N.J. Super. at 435.

Here, the Division properly ruled out defendants' relatives because they either withdrew from consideration; were ruled out based on their background checks; were proposed after John had formed a bond with his resource parents; or a combination of those reasons. More importantly, the undisputed expert

15

evidence confirmed John had a strong attachment to his resource parents and would suffer severe and enduring harm if removed from them. And, John's resource parents are no strangers to Mother: they are the parents of Mother's friend, Colleen, with whom John was placed – at Mother's request – before Mother named Father as a potential biological parent.

Moreover, the resource parents are committed to adopting John. In that regard, after briefing on this appeal, we granted the Division's motion for a limited remand for the trial court to clarify the resource parents' commitment to adoption or preference for kinship legal guardianship (KLG) pursuant to N.J. Division of Child Protection & Permanency v. M.M., 459 N.J. Super. 246 (App. Div. 2019). Another judge conducted the remand hearing, during which the Division presented the testimony of the resource parents and the adoption caseworker.

In a cogent oral decision, the motion judge found the testimony of the Division's witnesses credible, remarking the resource parents were "extremely forthright." Citing our decision in M.M., the judge found the Division demonstrated "by clear and convincing evidence that the resource parents were fully informed regarding the benefits and burdens of KLG" and "the differences between KLG and adoption." The judge concluded the resource parents were

"fully committed to adoption," and their decision to adopt John was "unconditional, unambiguous and unqualified." Given our discretionary standard of review, we discern no reason to disturb the judge's decision, which is fully supported by the record. R.G., 217 N.J. at 552.

"[T]o satisfy the fourth prong, the State should offer testimony of a well-qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents." M.M., 189 N.J. at 281 (citation omitted). An important consideration under this prong is "the child's need for permanency." Ibid. "Ultimately, a child has a right to live in a stable, nurturing environment and to have the psychological security that his most deeply formed attachments will not be shattered." F.M., 211 N.J. at 453.

The uncontroverted expert evidence in this case provides overwhelming support for the trial judge's finding that there is a deep bond between John and his resource parents and that he would suffer serious and enduring emotional or psychological harm if he were separated from them. John has lived with his foster parents continuously since he was six months old. Importantly, he has no bond with defendants. Moreover, John's resource parents have now made it unequivocally clear they want to adopt John. Accordingly, this is a case in

17                                                          A-1820-18T2

which "termination of . . . parental rights [will] secure for [John] a safe, loving home and the care of . . . stable adult[s] who [are] intent on assuring the child's psychological and physical well-being." N.J. Div. of Youth & Family Servs. v. T.S., 417 N.J. Super. 228, 248 (App. Div. 2010).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1820-18T2