# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1103-19T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

S.S.,

      Defendant,

and

J.H.P.,

      Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF
C.A.P. and C.R.P., minors.

_____

Submitted December 9, 2020 – Decided December 24, 2020

Before Judges Alvarez and Mitterhoff.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FG-20-0030-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Catherine Wilkes, Assistant Deputy Public Defender, of counsel and on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney General, of counsel; Frank R. Moceri, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd Wilson, Designated Counsel, on the brief).

PER CURIAM

Defendant J.H.P.[1] appeals from the October 25, 2019 judgment of guardianship terminating his parental rights as to his children, C.A.P. and C.R.P.[2] On appeal, J.H.P. argues that (1) the trial judge improperly relied on expert testimony

---

[1] Pursuant to Rule 1:38-3(d)(12), we use initials to protect the confidentiality of the participants in these proceedings.

[2] The judgment also terminated the parental rights of the children's mother, S.S. However, S.S. did not participate in the underlying litigation and is not appealing the termination of her parental rights.

that constituted a net opinion;[3] (2) the judge impermissibly relied on attorney stipulations; (3) the Division of Child Protection and Permanency (Division) failed to establish the prongs of the "best interests standard" embodied in N.J.S.A. 30:4C-15.1(a); and (4) he received ineffective assistance of counsel. The Law Guardian supported termination during the trial and, on appeal, joins the Division in urging us to reject J.H.P.'s arguments and affirm. Having reviewed the record, and considering the applicable legal principles, we affirm substantially for the reasons set forth in Judge Marc Brown's thorough and thoughtful fifty-seven-page oral decision. We add only the following comments.

The Division first became involved with J.H.P. and S.S. on April 2, 2014 due to a report that J.H.P. allegedly posted on Facebook that he was smoking and selling marijuana while caring for C.R.P. The next referral took place on August 8, 2016, and during the subsequent investigation, J.H.P. admitted to frequent substance abuse. The Division was referred again on October 19, 2016 after allegations that J.H.P. tried to overdose on Tylenol PM. While at Trinitas Hospital, J.H.P. admitted he was diagnosed with Oppositional Defiant Disorder (ODD), bipolar disorder,

---

[3] J.H.P. did not file a motion seeking to bar the doctor's testimony as a net opinion, nor did J.H.P. object to this testimony at trial. Because this issue was not raised below, we do not address it. See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) ("our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available").

explosive disorder, and slight depression as a teenager, but stated he was not on medication. The last referral, which initiated the present litigation, occurred on January 29, 2017 due to a report that J.H.P. was using drugs and threatened to kill the children as well as himself. The Elizabeth Police Department discovered a large knife in J.H.P.'s bedroom, which he claimed was to cut fruit at night.

The children were removed from J.H.P.'s custody on January 30, 2017. After several unsuccessful placements, the children were eventually placed with the paternal grandmother R.Q. on April 12, 2019.

After the children's removal from his care, J.H.P. engaged in sporadic visitation with the children until his admission to Cornerstone Behavioral Treatment Center from June to August 2017. J.H.P. was subsequently admitted to Greystone Psychiatric Hospital in January 2018,[4] where he reported that at the age of thirteen he had been diagnosed with Bipolar Disorder. J.H.P. was ultimately discharged from Greystone on or about March 18, 2019. Dr. Sangeet Khanna, a psychiatrist at Greystone, indicated that J.H.P.'s admission records as well as the information received during his admission met the threshold of the duty to warn under N.J.S.A. 2A:62A-16(b).

---

[4] While at Greystone, J.H.P. revealed that he was refusing to take medication because he was "asymptomatic," and was not participating in any services.

After his discharge from Greystone, the Division referred J.H.P. for substance evaluations at the Child Protection Substance Abuse Initiative (CPSAI), but he missed two appointments on April 9 and April 16, 2019. J.H.P. did, however, attend an appointment on April 23, 2019, where he tested positive for marijuana use. The diagnostic impression revealed that J.H.P. did "not understand the risk associated with using illicit drugs and how his use can contribute to more mental health instability." CPSAI recommended that J.H.P. attend a co-occurring program at Community Care Behavioral Health. On May 22, 2019, the intake coordinator at Community Care informed the Division that J.H.P. had been closed out the program for failing to attend three intake appointments. Since his release from Greystone, J.H.P. attended only seven out of twenty-nine possible visits.

At trial, Dr. Allison Strasser Winston testified as to her June 22, 2018 psychological and bonding evaluation with J.H.P. Dr. Winston testified that her clinical interview with J.H.P. revealed that he was "guarded" and "minimized a lot of the concerns that" the Division raised. Dr. Winston noted that J.H.P. indicated he smokes as much as "twice a day" and has "experimented with Molly." In that regard, Dr. Winston stated that J.H.P. admitted he "would sometimes be under the influence of marijuana when he was taking care of children" and denied the fact it affected his parenting ability.

A-1103-19T4

Dr. Winston indicated that the results of the Personality Assessment Inventory (PAI) revealed that, despite presenting in a "highly defensive" manner, J.H.P. still had an elevated score on the paranoid subscale and exhibited "significant paranoid symptomology." Dr. Winston observed that the PAI evinced possible diagnoses of "Adjustment Disorder Unspecified, Bipolar-1 Disorder, Substance Dependence, and an Unspecified Personality Disorder." Dr. Winston opined as to J.H.P.'s paranoid thought processes, including his beliefs that "undercover cops always watching him" and that his mother and sister "made false allegations with (or [against]) him" which resulted in his hospitalization.

Dr. Winston expressed concern that J.H.P. had "no insight into his mental health issues" because he refused to acknowledge he has mental health issues and, because he refused to take his mediation, poses a risk of harm to himself and others. Dr. Winston was particularly concerned because "people with a psychoses do kind of incorporate other people who are in their environment into their psychotic thinking" and that "something could happen that would make him believe that the children are out to hurt him[,] . . . [and] he could hurt the children trying to protect himself from this delusional thought that the children want to hurt him." Dr. Winston believed that if the children were returned to J.H.P., it would cause them "significant

6

harm," and J.H.P.'s "serious untreated mental health issues" posed a "very high risk" to them.

Based on her observations during the bonding evaluation, Dr. Winston opined that, although the children were comfortable with J.H.P., they did not view him as a primary caregiver, but rather as "the fun Dad" and not "the person that they go to have their needs met." Dr. Winston indicated that there would be "some harm" if J.H.P.'s parental rights were terminated, but it would not rise to the level of "serious and enduring emotional harm." In that same vein, Dr. Winston testified that removing the children from R.Q. would cause "serious and enduring emotional harm" and that J.H.P. would be unable to mitigate this harm because he failed to seek "any services for himself," so it would be "very difficult to expect that he would seek service[s] for his children."

The Division offered Lynette Bernardo, one of the caseworkers assigned to J.H.P.'s case, to testify. Bernardo testified that the children "seemed happy" with R.Q. and found R.Q.'s home "suitable" for them. Bernardo's impression of the children's relationship with R.Q. was "happy and comfortable," and that "they seemed more at home there." Bernardo believed that R.Q. was "a good provider for the children" and "loves them." Bernardo's understanding was that R.Q. wanted to adopt the children. Bernardo testified the Division informed R.Q. of the Kinship

 A-1103-19T4

Legal Guardian option and that, ultimately, it was not a viable alternative because R.Q. wanted to adopt the children, believing it was in their best interest.

J.H.P.'s testimony substantiated many of Dr. Winston's concerns. J.H.P. indicated that he was not currently visiting the children because he believed the Division "has it out for [him]" and did not want to escalate issues with Bernardo. J.H.P. believed that he was committed to Greystone simply because he was homeless and denied the fact that he was admitted for his serious mental health issues. J.H.P. acknowledged that, while at Greystone, several doctors prescribed medication that he simply refused to take.[5] J.H.P. claimed that he did not attend outpatient services at Community Care due to "transportation issues," despite the fact that the Division provided him with a bus card and train tickets for this very purpose.

J.H.P. admitted that he smoked marijuana "frequently" and stated that he did so "in the room next to [the children], when they were watching TV." J.H.P. also admitted to huffing inhalants from aerosol cans prior to his admission at Greystone. J.H.P. testified that he was not currently enrolled in any program for substance abuse treatment or rehabilitation. J.H.P. did not believe such treatment would be "beneficial in any way," describing it as "counterintuitive." J.H.P. stated that if he

---

[5] J.H.P. testified that he refused to take the anti-psychotropic medication because he assumed it would look better if he was discharged without taking medication.

were to attend substance abuse treatment, nothing would change; whenever he had the time, he would "to go to the bar and drink a beer[.]"

J.H.P. testified that he remains unemployed but has been receiving Social Security since childhood due to his earlier mental health diagnoses. Moreover, J.H.P. conceded that he was only able to lease an apartment with the assistance of Bridgeway Tri-County Residential Intensive Support Team (RIST), a program that was designed to assist people with mental health issues re-enter the community after being discharged from a psychiatric facility.

At the conclusion of trial, the trial judge delivered an oral opinion terminating J.H.P. and S.S.'s parental rights after finding the Division had satisfied the four prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. The judge found Dr. Winston to be "extremely credible" and observed no contradictions in her testimony. Likewise, the judge found Bernardo to be "reasonable" and "extremely credible." The judge found that J.H.P.'s testimony, on the other hand, was "incredible" and determined that J.H.P. continued to "refuse to acknowledge his problems that led to the removal of the children from his care years ago" while still continuing "to blame others for his own problems and issues, including mental health and substance abuse." The judge observed that J.H.P. has no insight as to his problems and their effect on the children.

The trial judge found that J.H.P. had ongoing, unmitigated mental health and drug problems which continued to endanger the children's health and development. The judge also determined that J.H.P. refused to follow the recommendations of health care professionals that he engage in therapy and take psychotropic medication and failed to comply with the numerous opportunities for treatment. The judge, highlighting the fact that J.H.P. only visited the children seven times despite having twenty-nine opportunities to do so, noted that "the only time that [J.H.P.] was interested in seeing the children as to maintain a relationship with them, was when no effort was required of him. When he was required to do anything to see the children, he chose to do nothing." The judge determined that the Division had made reasonable efforts to supply rehabilitative and other services, as well as to explore alternative placements for the children. The trial judge found that R.Q. wanted to adopt the children after being fulling informed as to the option of KLG.

An accompanying order terminating parental rights was entered on October 25, 2019. This appeal ensued.

I.

Our scope of review on appeals from orders terminating parental rights is limited. In such cases, we will generally uphold the trial judge's factual findings, so long as they are "supported by adequate, substantial, and credible evidence." New

Jersey Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014) (citing New Jersey Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)). Indeed, we must give substantial deference to Family Part judges' special expertise and opportunity to have observed the witnesses firsthand and evaluate their credibility. Id. at 553. Thus, a termination decision should only be reversed or altered on appeal if the trial judge's findings are "so wholly unsupportable as to result in a denial of justice." New Jersey Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).

## II.

J.H.P. argues that the trial judge impermissibly relied on the stipulations set forth in the July 25, 2019 letter because they were unsupported by any documentary evidence. J.H.P. also contends that the judge improperly relied on Bernardo's hearsay testimony.[6] We are not persuaded.

Because J.H.P.'s counsel agreed to stipulate to this evidence at trial, he is barred from challenging its admissibility on appeal under the doctrine of invited

---

[6] "[H]earsay subject to a well-founded objection is generally evidential if no objection is made." N.J. Div. of Child Prot. & Permanency v. J.D., 447 N.J. Super. 337, 348-49 (App. Div. 2016). We are untroubled where, as here, "objectionable hearsay is admitted in a bench trial without objection," because "we presume that the fact-finder appreciates the potential weakness of such proofs, and takes that into account in weighing the evidence." Id. at 349.

error. "Under that settled principle of law, trial errors that were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal." State v. A.R., 213 N.J. 542, 561 (2013) (internal quotation marks omitted). "'The doctrine of invited error operates to bar a disappointed litigant from arguing on appeal that an adverse decision below was the product of error, when that party urged the lower court to adopt the proposition now alleged to be error.'" N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 340 (2010). Pursuant to M.C. III, J.H.P.'s belated evidentiary arguments are now barred by the doctrine of invited error as his counsel consented, on multiple occasions, to the stipulated material. We are mindful of our Court's reluctance to "automatically apply the doctrine [of invited error] if it were to 'cause a fundamental miscarriage of justice.'" Id., 201 N.J. at 342 (quoting Brett v. Great Am. Rec., 144 N.J. 479, 508 (1996)). We are convinced, however, that "this case presents no fundamental injustice that would warrant relaxing the invited error doctrine." Ibid.

## III.

We also reject J.H.P.'s argument that the Division failed to satisfy the best-interests standard to justify the termination of his parental rights. Parents have a constitutionally protected right to the care, custody, and control of their children. In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). However, that right is not

absolute. R.G., 217 N.J. at 553; N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009). To effectuate these concerns, the Legislature created a test to determine when it is in the child's best interest to terminate parental rights. To terminate parental rights, N.J.S.A. 30:4C-15.1(a) requires the Division to prove four prongs by clear and convincing evidence:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from [her] resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the [judge] has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.[7]

---

[7] J.H.P. does not address the fourth prong of N.J.S.A. 30:4C-15.1(a) and, therefore, we will not discuss it. See Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011) ("An issue not briefed on appeal is deemed waived.").

A-1103-19T4

The four prongs of the test are "not discrete and separate," but "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348. "The considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the specific circumstances in the given case." Ibid. (quoting In re Adoption of Children by L.A.S., 134 N.J. 127, 139 (1993)).

## A. Prongs One and Two[8]

We agree with the trial judge that J.H.P.'s failure to treat his ongoing mental health and substance abuse issues using the services provided through the Division was an adequate basis to find N.J.S.A. 30:4C-15.1(a)(1) and (2) were satisfied. See, e.g., N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 450-51 (2012) ("Mental illness, alone, does not disqualify a parent from raising a child. But it is a different matter if a parent refuses to treat his [or her] mental illness" and the "mental illness poses a real threat to [the] child . . . . "); N.J. Div. of Youth & Family Servs. v. H.R., 431 N.J. Super. 212, 224 (App. Div. 2013) (affirming a finding of prong

---

[8] The first two prongs of the best interest standard, N.J.S.A. 30:4C-15.1(a)(1) and (2), are related "components of the harm requirement," and "evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child." In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999). Because the first two prongs are intertwined, we "address prongs one and two of that test" together. See E.P., 196 N.J. at 104.

two where father enrolled in drug treatment programs but "routinely failed to complete them with positive results"); see also P.P., 180 N.J. at 512 (affirming the termination of parental rights where the parents were "unable to provide for their children in the past due to their significant and long-standing substance abuse histories and to their repeated failure to comply with DYFS recommendations and court orders for services.").

Here, J.H.P. failed to recognize that he was committed to Greystone for his serious mental health issues; instead, he chose to believe he was admitted because he was homeless. While at Greystone, J.H.P. refused to take psychotropic medication that was prescribed by multiple doctors. Similarly, J.H.P. also has failed to mitigate his recurring substance abuse issues. J.H.P. admitted that he smoked marijuana "frequently" and did so in the next room while the children watched television. Even after various referrals, J.H.P. was not enrolled in any program for substance abuse treatment or rehabilitation at the time of trial. In fact, J.H.P. stated that even if he were to attend treatment, nothing would change and that whenever he had the chance he would go to the bar and drink. Because the judge's decision was supported by adequate, substantial, and credible evidence in the record, we discern no basis to disturb it.

## B. Prong Three

The trial judge also correctly concluded that the Division offered reasonable services to J.H.P. and investigated alternatives to termination. In that regard, various services and referrals were offered to J.H.P. since he first became involved with the Division. The record also clearly shows that the Division investigated and ruled out other options before resorting to terminating J.H.P.'s parental rights. The Division explored the possibility of a Kinship Legal Guardian (KLG) agreement with J.H.P.'s mother, R.Q. Bernardo testified that the Division informed R.Q. of the KLG option and that, ultimately, it was not a viable alternative because R.Q. wanted to "adopt the children, because she felt like that was what was in their best interest." Dr. Winston also opined that KLG was not a good alternative under these circumstances because it did not provide the children with the same level of stability. Where, as here, the "the permanency provided by adoption is available, [KLG] cannot be used as a defense to termination of parental rights." R.G., 217 N.J. at 558-59 (quoting P.P., 180 N.J. at 513) (alteration in original). We conclude the trial judge's determination that the Division satisfied prong three of N.J.S.A. 30:4C-15.1(a) was amply supported by adequate and credible evidence in the record.

To the extent we have not addressed the remaining arguments, we are satisfied they lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E).

16                                                                    A-1103-19T4

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1103-19T4