# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1887-20

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

S.O.,

     Defendant-Appellant,

and

J.F.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.F.,
a minor.

_____

Submitted December 1, 2021 – Decided January 27, 2022

Before Judges Gilson, Gooden Brown, and Gummer.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Gloucester County, Docket No. FG-08-0030-20.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Richard Sparaco, Designated Counsel, on the briefs).

Andrew J. Bruck, Acting Attorney General, attorney for respondent (Donna Arons, Assistant Attorney General, of counsel; John J. Lafferty, IV, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

S.O. (Samantha) appeals from a judgment terminating her parental rights to her minor son, A.F. (Albert), and granting guardianship to the Division of Child Protection and Permanency (Division) with the plan that Albert be adopted by his resource parents.[1] Samantha argues that the Division failed to establish three prongs of the best interests of the child standard set forth in N.J.S.A. 30:4C-15.1(a). We disagree and affirm the judgment.

---

[1] We use initials and fictitious names to protect privacy interests and the confidentiality of the record. See R. 1:38-3(d)(12).

2                                                                    A-1887-20

I.

Samantha and J.F. (James) are the biological parents of Albert, who was born in October 2014. The Division became involved with the family a year after Albert was born; Albert was later removed from his parents' care when he was nineteen months old.

In May 2016, Samantha and James brought Albert to a hospital because Albert had a high fever. Hospital personnel observed extensive injuries all over Albert's body. Albert's injuries included a bruised and broken elbow, a broken femur near his hip, bruises around his left knee, and abrasions on his penis. Albert was hospitalized for six days, and he underwent surgery to repair his broken elbow.

Based on concerns of parental abuse and neglect, Albert was removed from his parents' care when he was released from the hospital on May 24, 2016. Albert was initially placed with a relative but shortly thereafter was placed with a resource family and has been with that family for over five years.

Following an investigation, James was criminally charged with endangering the welfare of a child and assault. Thereafter, he pled guilty to a lesser offense. A no-contact order was entered preventing James from having

contact with Albert. Samantha was not substantiated for abuse or neglect related to the injuries Albert suffered in May 2016.

Nevertheless, the Division had concerns regarding Samantha's substance abuse, mental health, and inability to find stable housing, which prevented her from establishing a stable environment for Albert's return. To address those concerns, the family court ordered Samantha to complete several evaluations, including substance-abuse and psychological evaluations.

The substance-abuse evaluation, and related drug testing, established that Samantha was using drugs. During her initial evaluation, Samantha tested positive for the use of marijuana, cocaine, and prescribed methadone. In January 2017, Samantha began substance-abuse treatment, but was discharged one month later for non-compliance. Thereafter, she started outpatient treatment and completed the program in September 2017. Samantha maintained sobriety for a period but relapsed twice, testing positive for methamphetamines in the fall of 2019 and for amphetamines and methamphetamines in June 2020. In January 2021, Samantha was successfully discharged from an outpatient substance-abuse program.

In terms of her mental health, Samantha was diagnosed with bipolar disorder, anxiety disorder, and post-traumatic stress disorder. With the

4

Division's assistance, Samantha received several years of counseling and therapy. She was twice hospitalized in 2019 due to depression with a high risk of suicide and for a lithium overdose.

Samantha also struggled to establish and maintain a stable living environment. Between May 2016 and January 2021, Samantha lived in eleven different locations and was twice incarcerated in jail, once for several months.

The Division also had concerns about Samantha's ability to protect Albert. In 2018, Samantha had an unsupervised visit with Albert. During that visit, Samantha allowed James to ride in a car with Albert even though there was a no-contact order in place.

In November 2017, the Division filed a complaint for guardianship of Albert because Samantha continued to struggle with substance abuse and had not obtained stable housing. When Samantha showed improvement in January 2019, the Division changed its permanency plan to reunification.

A year later, however, the Division again sought guardianship because Samantha had twice been hospitalized for mental-health reasons, had relapsed by using drugs, had acknowledged her instability to a Division worker, and had been unable to manage basic life tasks, preventing her from being able to meet Albert's needs. In the meantime, Albert had been living with a resource family

for almost four years. Albert was doing well in that environment and his resource parents wanted to adopt him.

A one-day guardianship trial was conducted on January 29, 2021. Two witnesses testified: Kyle Harrison, a Division adoption worker, and Dr. Alan Lee, an expert in psychology. The Division also submitted numerous exhibits into evidence. Samantha elected not to testify and called no witnesses.

After 2019, the Division lost contact with James, and he did not participate in the guardianship trial. The family court terminated James' parental rights based on abandonment, and James has not appealed from that judgment.

Harrison testified about his periodic involvement with Albert from November 2017 through January 2021. Harrison explained that he had visited Albert in the resource home on numerous occasions and reported that Albert appeared to be doing well and was treated like a member of the family. Harrison also testified that on several occasions, Albert had expressed the desire to be adopted by his resource family. In addition, Harrison explained the sharp differences he observed in Albert's interactions with his resource parents compared to interactions with Samantha. While Albert was playful and excited when he was with his resource family, he was disrespectful, aggressive, and repeatedly tried to run away when visiting with Samantha. Harrison testified

A-1887-20

that he had discussed the possibility of kinship legal guardianship (KLG) with Albert's resource parents, but they informed him that they had no interest in KLG and instead wanted to adopt Albert.

Dr. Lee testified about various evaluations he had conducted. He explained that he had conducted a psychological evaluation of Samantha in March 2020. Dr. Lee diagnosed Samantha with bipolar disorder, generalized anxiety disorder, and an unspecified personality disorder with borderline antisocial and dependent traits. He opined that Samantha's mental-health issues left her in an "unstable situation." Dr. Lee also explained that Samantha had admitted to using various drugs over a long period of time. Dr. Lee opined that Samantha's significant history of substance abuse left her at high risk for relapse and "ongoing life instabilities."

Dr. Lee also testified about bonding evaluations he had conducted. Dr. Lee performed a bonding evaluation between Albert and Samantha and found that Albert had "an ambivalent and insecure attachment and relationship with" Samantha. Dr. Lee opined that there was a low risk of Albert suffering enduring harm if his relationship with Samantha was ended.

By contrast, based on a bonding evaluation Dr. Lee conducted with Albert and his resource parents, Dr. Lee opined that Albert had a significant and

7

positive psychological bond with his resource parents. He opined that if Albert's relationship with his resource parents were to end, there would be a significant risk that Albert would suffer severe and enduring harm. Dr. Lee opined that Samantha would not be able to mitigate that harm because she was not able to provide "a minimal level of appropriate care or parenting" to Albert.

Based on his evaluations, Dr. Lee stated that he supported a permanency plan for Albert where he would be adopted by his resource parents rather than being reunited with Samantha. In that regard, he opined that the benefits of Albert remaining with his resource family "far outweigh[ed] any risk or possible harm" of Albert not being with Samantha.

After hearing the testimony at trial and considering the evidence, on February 12, 2021, the trial court issued a judgment terminating Samantha's parental rights. The court detailed its findings of facts and conclusions of law in an oral decision read into the record. The court found that the Division had satisfied all four prongs of the best-interests standard under N.J.S.A. 30:4C-15.1(a).

Addressing prongs one and two, the court held that the Division met its burden. In that regard, the family court found that it was "not [Samantha's] actions, as much as her inactions" that led to Albert's harm. The court found

8

that Samantha remained unable to provide Albert with a stable home even after years of being provided with services by the Division. Closely connected to that harm, the court found that reuniting Albert with Samantha would place Albert at risk of harm from James. In making that finding, the court noted that Samantha had placed Albert in a position of potential harm when she allowed James to have contact with Albert in disregard of the court's no-contact order.

The court also found that Samantha continued to struggle with mental-health and substance-abuse issues despite years of services. The court pointed out that Samantha had participated in numerous substance-abuse programs over several years but then relapsed. The court also noted that Samantha had been hospitalized two times during the guardianship litigation for mental-health and substance-abuse issues. In addition, the court noted that even after four years, Samantha had no "definitive or realistic" housing plan and that she was unstable and unable to provide Albert with a stable environment.

Addressing prong three, the court found that the Division had made reasonable efforts to provide services to Samantha. The court noted that the Division had provided Samantha with substance-abuse evaluations and treatment, mental-health examinations, a domestic-violence assessment, and transportation assistance, including bus passes to travel between Pennsylvania

9

and New Jersey and car rides from Division aides to and from bus stops. The transportation assistance enabled Samantha to attend services and visits with Albert.

Under prong four, the court found the Division had presented clear and convincing evidence that termination of Samantha's parental rights would not do more harm than good. In that regard, the court primarily relied on the unrebutted testimony of Dr. Lee. The court credited Dr. Lee's opinion that Albert did not have a significant and positive psychological bond with Samantha. The court also relied on Dr. Lee's finding that Albert did have a significant and positive psychological attachment with his resource parents and there was a significant risk that Albert would suffer severe and enduring psychological and emotional harm if that relationship ended. Accordingly, the family court entered a judgment terminating Samantha's rights and granting guardianship to the Division with the plan that Albert be adopted by his resource parents. Samantha now appeals from that judgment.

II.

On appeal, Samantha challenges the trial court's findings on prongs one, two, and three of the best-interests standard. First, Samantha argues there was insufficient evidence to show that Albert had been or will be endangered by her

parental relationship. Second, she asserts that there was insufficient evidence that she was unable to eliminate the harm to Albert. Finally, she contends that the trial court erred in finding that the Division had made reasonable efforts to facilitate reunification. We are not persuaded by these arguments.

As an appellate court, our review of a trial court's decision to terminate parental rights is limited. N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014). Appellate courts defer to a trial court's credibility determinations and factual findings. N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007)).

To terminate parental rights, the Division must prove by clear and convincing evidence:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource

11

family parents would cause serious and enduring emotional or psychological harm to the child; [²]

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

1.    Prong One

Under the first prong of the best-interests standard, "the Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Dep't. of Child. & Fams., Div. of Youth and Fam. Servs. v. A.L., 213 N.J. 1, 25 (2013) (quoting In re Guardianship of K.H.O., 161 N.J. 337, 352 (1999)). Harm to the child need not be physical as "[s]erious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury

---

[²] Effective July 2, 2021, N.J.S.A. 30:4C-15.1(a)(2) was amended to delete the second sentence of subsection 2, thereby excluding from consideration the harm to a child caused by removal from his resource parents. Samantha has not argued that the amended statute applies retroactively, and we see no basis on this record for applying the amendment retroactively. See R. 2:6-11(d); see also James v. N.J. Mfrs. Ins. Co., 216 N.J. 552, 563 (2014) (recognizing that amendments and new statutes are generally applied prospectively).

sufficient to authorize the termination of parental rights." In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992). A parent's "withdrawal of [] solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999).

In analyzing prong one, it is appropriate to consider whether the parent has harmed or is likely to continue causing harm. N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 506 (2004). "Harm, in this context, involves the endangerment of the child's health and development resulting from the parental relationship." Ibid. (quoting K.H.O., 161 N.J. at 348). Accordingly, a court need not "wait 'until a child is actually irreparably impaired by parental inattention or neglect.'" N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 449 (2012) (quoting D.M.H., 161 N.J. at 383). Although the second prong of the best-interests standard more directly focuses on conduct equating to parental unfitness, a court can consider elements that apply to prongs one and two because they both focus on the harm requirement. D.M.H., 161 N.J. at 379. Accordingly, prongs one and two of the best-interests standard "are related to one another, and evidence that supports one informs and may support the other

as part of the comprehensive basis for determining the best interests of the child." Ibid.

Samantha argues that the trial judge's finding concerning prong one was not supported by sufficient evidence. She contends that she never caused Albert physical harm and she posed no risk to Albert. In that regard, she points out that the physical harm that resulted in Albert's removal in 2016 was caused by James and she was not substantiated for abuse or neglect. She also argues that the trial court failed to consider that there was no interaction between Albert and James when she violated the no-contact order and gave James a ride in the car while Albert was in the car with her.

Given the factual findings made by the trial court, we reject these arguments. The trial court found several different bases establishing clear and convincing evidence that Samantha had and would continue to pose a danger to Albert and identified those facts in its discussion of prongs one and two. In doing so, the court relied on Samantha's history of mental illness and substance abuse. The court found that Samantha had been diagnosed with bipolar disorder, post-traumatic stress disorder, anxiety, and suicidal ideations, and had a history of hospitalizations for substance-abuse or mental-health issues. In addition, the court found that Samantha had failed to provide Albert with a suitable or stable

14

living environment. Samantha's decision to allow James to ride in a car with Albert, in disregard of the no-contact order, also concerned the court. All the trial court's findings are supported by substantial credible evidence in the record, and we discern no basis for rejecting them.

In short, Samantha's ongoing struggles with substance-abuse and mental-health issues demonstrate that there would be a substantial risk to Albert's safety and health if he were placed back in Samantha's care. Our Supreme Court has held that a court need not "wait" until a child is irreparably harmed and, therefore, we discern no factual or legal error in the trial court's determination concerning prong one.

2.    Prong Two

The inquiry under prong two "centers on whether the parent is able to remove the danger facing the child." F.M., 211 N.J. at 451. Prong two can be established by "indications of parental dereliction and irresponsibility, such as . . . the inability to provide a stable and protective home." K.H.O., 161 N.J. at 353. "Prong two may also be satisfied if 'the child will suffer substantially from a lack of . . . a permanent placement and from the disruption of [the] bond with foster parents.'" F.M., 211 N.J. at 451 (alterations in original) (quoting K.H.O., 161 N.J. at 363).

Also relevant to an analysis under prong two is whether the delay of permanent placement led to harm. K.H.O., 161 N.J. at 349. Courts recognize the right a child has to permanency, noting that "[c]hildren must not languish indefinitely in foster care while a birth parent attempts to correct the conditions that resulted in an out-of-home placement." N.J. Div. of Youth & Fam. Servs. v. S.F., 392 N.J. Super. 201, 209 (App. Div. 2007). See also N.J. Div. of Child Prot. & Permanency v. S.D., 453 N.J. Super. 511, 524 (App. Div. 2018) (explaining that "[p]arents do not have the right to extend litigation indefinitely until they are able to safely care for their children").

The trial court found that Samantha was not able to secure housing suitable for reunification with Albert, noting that she had lived in many locations, had been incarcerated, was living in a group home, and did not present a definitive or realistic housing plan. Samantha had over four years to find suitable housing for Albert with no success. Accordingly, the trial court's findings on prong two are also supported by substantial credible evidence in the record.

3.    Prong Three

Under prong three, the Division must show that it made "reasonable efforts to provide services to help the parent correct the circumstances which led

16

to the child's placement outside the home." N.J.S.A. 30:4C-15.1(a)(3). "Reasonable efforts include consulting with the parent, developing a reunification plan, providing services essential to realizing the reunification plan, informing the family of the child's progress, and facilitating visitation." R.G., 217 N.J. at 557.

The trial court found that the Division had provided Samantha with numerous services. Those services included a domestic-violence assessment, substance-abuse evaluations and treatment, and psychological evaluations. The evidence presented at trial demonstrates that Samantha had received counseling and therapy services for several years. The court also found that the Division provided transportation assistance to Samantha so that she could attend services and visit Albert.

Samantha contends that she made herself available for all medical examinations and therapy, completed a domestic-violence assessment, and complied with substance abuse evaluations and treatment. Despite those services, the record also establishes that Samantha had two substance-abuse relapses and was hospitalized twice for mental-health reasons in 2019. The critical focus remains the best interests of the child. F.H., 389 N.J. at 622. When all the evidence is considered, the record clearly establishes that the Division

17

provided reasonable services in an attempt to reunite Samantha and Albert, but ultimately the Division clearly and convincingly demonstrated that Samantha had not obtained the needed level of stability and was unlikely to obtain and maintain stability so as to properly parent Albert.

In summary, the trial court's findings concerning prongs one, two, and three are supported by substantial credible evidence. Samantha has not challenged the trial court's findings concerning prong four, which are supported by substantial credible evidence in the record. The trial court's fact findings, viewed in light of the well-established law, demonstrates that the Division proved by clear and convincing evidence each of the four factors supporting termination of parental rights under N.J.S.A. 30:4C-15.1(a). Accordingly, the record does not support any of Samantha's arguments.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION