# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2792-23

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

N.S.C.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF T.B.C.
and T.D.C., minors.

_____

     Argued January 28, 2025 – Decided March 7, 2025

     Before Judges Smith and Chase.

     On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FG-04-0019-24.

     Adrienne M. Kalosieh, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer

Nicole Sellitti, Public Defender, attorney; Adrienne M. Kalosieh, on the briefs).

Mary L. Harpster, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; Mary L. Harpster, on the brief).

Julie E. Goldstein, Assistant Deputy Public Defender, argued the cause for minors (Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney; Meredith A. Pollock, Deputy Public Defender, of counsel; Julie E. Goldstein, of counsel and on the brief).

PER CURIAM

Defendant N.S.C. ("Nora") appeals the Family Part's October 26, 2023 final judgment terminating her parental rights to her biological children, T.B.C. ("Tina") and T.D.C. ("Tammy") following a one-day trial.[1]  We affirm.

I.

Tina was born to Nora and H.F. in December 2007.  H.F. died in December 2021.  Nora and H.F. are also the parents of Tina's older brother, Tom, who is not part of this litigation.  Tammy was born to Nora in June 2022.  Nora claimed another individual, C.S., as Tammy's father, but genetic testing showed he was

---

[1]  We employ initials and pseudonyms to identify the parties, the children, and others to protect the children's privacy and because the records relating to Division proceedings held under Rule 5:12 are excluded from public access under Rule 1:38-3(d)(12).

not the father. Nora provided no other information as to a possible identity of Tammy's father.

When Tina was born in 2007, the hospital contacted the Division hotline because both Tina and Nora tested positive for phencyclidine ("PCP"). Tina was placed in the neonatal intensive care unit ("NICU") following her premature birth, but she did not suffer from withdrawal. Nora admitted to using PCP, Xanax, and marijuana during her pregnancy. Nora was then diagnosed with post-partum depression and referred for mental health treatment. Both Tina and Nora were sent home with a safety protection plan, and the Division opened an administrative case to allow Nora to participate in substance abuse services and receive mental health treatment, but by the time Tina was fourteen months old, Nora had been terminated from three intensive outpatient ("IOP") drug treatment programs because she continued to test positive for PCP.

In February 2009, a caseworker contacted the Division and informed them that Nora failed three IOP programs and was refusing further treatment. The Division initiated an emergency removal due to Nora's continued drug use, her refusal to enter recommended treatment, and because she was the only adult caring for the children. Tina and Tom were placed in foster care on an emergency basis and were then placed with Nora's aunt, D.W. ("Diane"). In

3

June 2009, Nora stipulated that her PCP use put Tina at risk during pregnancy. In 2010, the court returned custody of the children to Nora.

In June 2022, the Division reopened the family's case when it received a report from the hospital that both Tammy and Nora tested positive for PCP at Tammy's birth. The Division executed an emergency removal of then-fourteen-year-old Tina and placed her in a nonrelative resource home. The Division attempted to place Tina with Diane, but her home was deemed unsafe. The next day, Tina told a Division investigator that Nora drank daily during pregnancy, and used a substance that "smelled horrible" and caused Nora to "yell and scream."

Initially, Nora denied using PCP, but later admitted to using the drug during her pregnancy despite being aware of the risks. Following Tammy's birth, the infant exhibited signs of withdrawal.

In July 2022, the court granted custody of Tina to the Division under both Titles 9 and 30. The court ordered Nora to comply with substance abuse and drug screenings. Tina was placed with Diane. However, Diane was deemed not to be a suitable placement for Tammy because Diane said she was unable to care for a newborn.

A-2792-23

That same month, Nora was recommended for a substance abuse assessment. In August, she had a psychological evaluation with Renee R. Maucher, Psy.D., who also recommended substance abuse treatment and individual and family therapy.

At the end of August, Tammy was discharged from the NICU after eight weeks and placed in an unrelated foster home. Around the same time, the court granted the Division custody of Tammy. In September 2022, Tammy was readmitted to the hospital. Following her discharge from the hospital, Tammy was placed with J.R., ("Jamie"), a distant cousin of Nora.

Throughout, Nora inconsistently attended outpatient treatment programs. For example, Nora was discharged from intensive outpatient treatment at the Center for Family Services ("CFS") because of poor attendance and failure to provide urine screens on two occasions. When Nora began the Genesis IOP program in December 2022, she tested positive for alcohol, marijuana, and PCP. She continued to test positive for PCP and tested positive for cocaine.

In February 2023, Nora was terminated from Genesis IOP because of non-attendance. She then started substance abuse and mental health treatment at The Work Group where she tested positive for PCP on several occasions throughout the next four months and refused a hair follicle test. The Work Group

A-2792-23

recommended her for a higher level of care, discharged her, and referred her to Turning Point's inpatient program, which she refused to attend. When asked about one positive test, Nora said that it resulted from her decision to smoke celebrating her son's entry into drug treatment and Nora laughed as she showed the worker documentation of a recent assault charge against her.

During this time, Tina began to refuse visits with Nora. Nora attended supervised visits with Tammy and maintained communication with Tina by phone. Diane told the caseworker she would facilitate visits with Tina, but that she did not wish to supervise them because Nora was unpredictable. Nora told the caseworker that she only wanted unsupervised visits with Tina and stopped attending them.

The Division informed Jamie about adoption and Kinship Legal Guardianship ("KLG"), and Jamie stated that she wanted to adopt Tammy if Tammy could not be returned to Nora. Jamie also stated that she wished for Nora to be present in Tammy's life. The Division also told Diane about KLG and adoption and Diane stated that she wanted to adopt Tina.

In the spring of 2023, Tina informed a caseworker that she did not want to be adopted. However, due to Nora's behaviors, Tina changed her mind about

returning to Nora's care. In October 2023 she stated that she wanted to be adopted.

On October 12, 2023, the Division filed a guardianship complaint for Tammy. On November 6, 2023, the Division amended the guardianship complaint to add Tina.

Although Nora began IOP at Solstice in September, she tested positive for PCP at least five times throughout the fall of 2023. In November, Nora rescinded her release of information from Solstice to the Division and refused to provide drug screens upon the caseworker's request. In December 2023, she was discharged from Solstice and the next month Nora entered inpatient detox and treatment at New Hope Integrated Behavioral Health Care. In early 2024, Nora was discharged after successfully completing the program with a recommendation to resume treatment at Solstice but ignored that request. She again tested positive for PCP and refused to provide a urine screen during a substance abuse assessment at the end of the month. She was referred to IOP at Princeton House Behavioral Health ("Princeton House"), but she refused to attend. She was next referred to Genesis IOP.

In February of 2024, Alan J. Lee, Psy.D., an expert in clinical and forensic psychology, conducted a psychological evaluation of Nora and bonding

A-2792-23

evaluations between Nora and her children and Jamie and Tammy. Tina later completed a bonding evaluation with Diane in April 2024.

Dr. Lee's evaluation found that Nora had no cognitive deficits, but that she had difficulties with coping and stress management, poor frustration tolerance, as well as other challenges. Dr. Lee diagnosed her with unspecified substance-related disorder, unspecified depressive order, unspecified anxiety disorder, and unspecified personality disorder with antisocial and borderline traits. In sum, Dr. Lee found "significant concerns" with Nora being an independent caretaker for her children and that her prognosis for "significant and lasting changes" within the foreseeable future was poor.

Dr. Lee stated that Tammy's reaction to Nora was generally neutral, and that Nora exhibited good affect in Tammy's presence. Dr. Lee found that there was a low risk of significant harm if the relationship between Tammy and Nora was terminated, Tammy had formed a significant and positive attachment with Jamie, and Tammy would suffer significant and enduring psychological harm if removed.

Dr. Lee also interviewed Tina, who said she had a "love and hate" relationship with her mother. Dr. Lee opined that Tina had an ambivalent relationship with her mother and would not suffer severe and enduring emotional

harm if their relationship was terminated. Dr. Lee observed a more positive relationship between Tina and Diane.

On April 24, 2024, the court conducted a one-day guardianship trial. At trial, Division caseworker David Cruz and Dr. Lee testified. Dr. Lee testified consistent with the findings and opinions stated in his report. Nora did not testify and called no witnesses.

Cruz stated that when he was initially assigned to the case, Nora admitted to using PCP, but later denied that she was still using. Although Cruz confirmed Nora had scheduled IOP services, he could not confirm her attendance because of her lack of cooperation with him. Cruz observed both Tina and Tammy were doing well in their respective placements. Cruz stated that he spoke with Tammy's caregiver Jamie about the differences between KLG and adoption. Jamie expressed a desire to adopt Tammy because she felt KLG would not be a proper arrangement because of Nora's aggression. As to Tina, Cruz described her as doing very well with Diane. Cruz stated that much of the contact between her and Nora was over the phone because Tina refused to attend family therapy.

After trial, the court issued an oral opinion terminating Nora's parental rights. The court found that Dr. Lee's testimony was credible "not just because it was undisputed," but also "because his multi-method approach" is a "type of

[methodology] used by experts in the field." The court "found his testimony to be just unbiased, detailed, consistent with the record," and provided detailed recommendations for services Nora could participate in. Regarding Cruz's testimony, the court found that he was credible because his testimony was consistent with the record and not biased.

The court discussed in detail the four-pronged best-interests-of-the-child test for terminating parental rights set forth in N.J.S.A. 30:4C-15.1(a). After analyzing the four prongs, the court stated, "[t]he record is crystal clear. The record is so clear, and the testimony is so clear that [Nora] has endangered, and will continue to endanger, the safety, health, and welfare of her vulnerable year-and-a-half-year-old daughter, as well as her teenage daughter by her un-remediated PCP use . . . ." The court also determined KLG was not an alternative to terminating Nora's parental rights because Nora was found to be "difficult to work with, she can be aggressive. She's got an inconsistent personality. It's a tough working relationship [with DCPP] at times. She wants to call the shots. And as [Tina] said, it's love/hate and it's toxic at times. These are not the ingredients of KLG."

On appeal, Nora claims the court erred in finding the Division satisfied by clear and convincing evidence for all four prongs of the statutory best interests

test.

## II.

Our scope of appellate review is limited. It is well established in Title 30 cases we will not second-guess or substitute our judgment for that of the family court, provided its factual findings are "grounded in substantial and credible evidence in the record." N.J. Div. of Child Prot. & Permanency v. D.C.A., 256 N.J. 4, 19 (2023). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). "We accord deference to fact[-]findings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). "[A] trial court's factual findings 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'" N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). We owe no deference to a judge's legal conclusions which are reviewed de novo. N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017).

The applicable law is clear. In considering whether to terminate parental rights, the trial court applies the statutory best interests test, which requires consideration of the following four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

The Division must prove each prong by "clear and convincing evidence." N.J. Div. of Child Prot. & Permanency v. D.H., 469 N.J. Super. 107, 115 (App. Div. 2021). These prongs "are not discrete and separate;" they overlap to inform a more general inquiry that the termination of parental rights is in a child's best interests. N.J. Div. of Child Prot. & Permanency v. R.L.M., 236 N.J. 123, 145 (2018). "'The question ultimately is not whether a biological mother or father

is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with that parent.'" N.J. Div. of Youth & Fam. Servs. v. T.S., 417 N.J. Super. 228, 249 (App. Div. 2010) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 108 (2008)). "'[P]arental fitness is the key to determining the best interests of the child.'" N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 170 (2010) (quoting In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999)).

"Parents have a constitutionally protected right to maintain a relationship with their children." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007). That right, however, "is not absolute" and is limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." F.M., 211 N.J. at 447. In guardianship and adoption cases, such as here, it is well-established that "[c]hildren have their own rights, including the right to a permanent, safe[,] and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). We acknowledge "the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." Ibid. Thus, a parent's interest must,

13

at times, yield to the State's obligation to protect children from harm. See N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009).

## III.

After carefully reviewing the record and applicable legal principles, we affirm for the reasons expressed in the comprehensive and cogent opinion of the trial judge. We add the following comments.

We see no support in the record for Nora's argument that the Division failed to satisfy the first two prongs of N.J.S.A. 30:4C-15.1(a). It is well established in Title 30 cases that actual harm to children need not occur and that the prospective risks of harm may suffice. The court need not "wait to act until a child is actually irremediably impaired . . . ." In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999). Tammy's withdrawal symptoms clearly showed she had been impaired by the parental relationship. Moreover, Dr. Lee's credible expert testimony confirmed that both Tina and Tammy had been harmed, and would continue to be harmed, by the parental relationship. His testimony was not rebutted.

Nor do we find support in the record for Nora's argument regarding prong three. Nora does not challenge the first part of prong three and the record is substantial that the Division showed it made reasonable efforts to assist her.

14

Instead, Nora challenges the second part, which requires the court to consider alternatives to the termination of parental rights. N.J.S.A. 30:4C-12.1. Here, the record shows the resource parents and Tina were informed of both KLG and adoption as permanency goals and chose adoption. The court considered KLG and correctly found it inappropriate under the facts of this case.

Lastly, Nora posits the Division did not demonstrate the termination of her parental rights will not do more harm than good. This fourth prong of the best interests test "serves as a fail-safe against termination even where the remaining standards have been met." E.P., 196 N.J. at 108. "The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with that parent." Ibid.

"[A] child's need for permanency is an extremely important consideration pursuant to this prong." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 559 (2014). "[A] child has a right to live in a stable, nurturing environment and to have the psychological security that his most deeply formed attachments will not be shattered." F.M., 211 N.J. at 453. But "[k]eeping the child in limbo, hoping for some long[-]term unification plan, would be a misapplication of the law." N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 438 (App.

15

Div. 2001).

The record supports the court's findings on prong four. There was ample evidence that, despite years of Division involvement and multiple treatment programs, Nora still was addicted to PCP and giving her more time would not make a difference. There was abundant evidence of the children's bonds with their new caregivers. Additionally, Dr. Lee concluded that there would be little harm to the children from the termination of Nora's parental rights.

To the extent we have not otherwise addressed any of appellant's remaining arguments, we determine they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division